**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 1999-CA-00200-SCT**

*IN THE MATTER OF THE ESTATE OF HULLY A. GRUBBS, DECEASED: F. GENE JACKS AND F. JOAN JACKS BROGDON*

*v.*

*VELMA WOODS, ESTHER CAMPBELL AND MARY ALICE GRUBBS THOMAS*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/1998 |
| TRIAL JUDGE: | HON. DENNIS M. BAKER |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | BARRETT BLAKE TELLER |
| ATTORNEYS FOR APPELLEES: | SAMUEL J. WAITS |
| | GEORGE W. WEAVER |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED - 02/10/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/2/2000 |

**BEFORE SULLIVAN, P.J., SMITH AND MILLS., JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1. Hully A. Grubbs died intestate on February 6, 1996, leaving as survivors the Appellees, Velma Wood, Esther Campbell and Mary Alice Grubbs Thomas. Appellants Freddy Gene Jacks and Joan Jacks Brogdon, who claim to be the illegitimate twin children of Hully Grubbs, filed a Petition to Determine Heirship on May 2, 1996, in the Chancery Court of Montgomery County, Mississippi. The trial commenced before the Honorable Dennis M. Baker, Chancery Judge, on October 14, 1997. Judge Baker found that Velma Wood, Esther Campbell and Mary Alice Grubbs Thomas are the sole heirs-at-law of Hully Grubbs, deceased. Final judgment was entered on January 11, 1999, and the Appellants timely filed a notice of appeal on February 1, 1999. They request that this Court reverse the finding of the chancery court and render a decision in favor of the Appellants, or, alternatively, that this Court remand this case to the chancery court for a new trial.

**STATEMENT OF FACTS**

¶2. Hully A. Grubbs was born on July 2, 1910, and lived in Montgomery County, Mississippi, until the age of 85. He married Mae Box on September 16, 1939, and they lived together until her death in September 1995. Hully Grubbs and Mae Box Grubbs had no children. Hully Grubbs died intestate on February 6,

1996. He left the following survivors: two sisters, Velma Wood and Esther Campbell, and a niece, Mary Alice Grubbs Thomas.

¶3. The administrator of the estate, Rodney Mortimer, employed John Sumner as attorney for the estate, which is valued at approximately $350,000. Shortly after the estate was opened, it came to the attention of Sumner that Hully Grubbs might have children born out of wedlock. In his effort to determine rightful beneficiaries of the estate, Sumner inquired into the matter. Sumner's inquiry revealed the possibility that the Appellants, Gene Jacks and Joan Jacks Brogden, fraternal twins, are the children of Hully Grubbs.

¶4. The twins were born, out of wedlock, to Mattie Jacks on December 24, 1937, and were adopted by the brother of Mattie Jacks, Jimmy Lee Jacks, and his wife, Nora Jacks, on August 1, 1938. The twins were raised by their adoptive parents in Vicksburg, Mississippi. Gene Jacks and Joan Jacks Brogden filed a Petition to Determine Heirship on May 2, 1996, alleging that they are the children of Hully Grubbs and should therefore inherit the estate to the exclusion of Velma Wood, Esther Campbell and Mary Alice Grubbs. At the time of the hearing before the chancery court, the twins were approaching their sixtieth birthday.

¶5. The body of Hully Grubbs was exhumed for the purpose of DNA analysis. Samples were collected and submitted to two independent testing labs, GenTest of New Orleans, Louisiana, and Genetic Design of Greensboro, North Carolina. The evidence presented at trial consisted of sixty years of rumor and gossip, plus the results of the genetic tests, which revealed a probability of paternity with regard to Gene Jacks of 83.7% and a probability with regard to Joan Jacks of 71.97%. Generally, the rumor and gossip went as follows. In 1937, Mattie Jacks sent a letter to Hully Grubbs stating that she was pregnant and requesting money. She allegedly sent like letters to four other men, namely, Allen Holiman, Sam Gardner, Jessie Kilgore, and Pete Sumner. Hully Grubbs showed the letter to his sister, Velma Wood. Hully Grubbs allegedly offered to marry Mattie Jacks, but she refused, stating she wanted only financial assistance. The specifics of the testimony are discussed in detail below. The only witnesses at the bench trial who were contemporaries of the events surrounding the birth of the twins were Velma Wood, the sister of Hully Grubbs, who testified by deposition, the parties having stipulated to her unavailability, and Lottie Grubbs, the sister-in-law of Hully Grubbs. All other witnesses related only rumor and gossip.

¶6. The chancellor found that Velma Wood, Esther Campbell and Mary Alice Grubbs Thomas are the sole heirs-at-law of Hully Grubbs, deceased. In his final opinion and order, the chancellor adopted, verbatim, the findings of fact and conclusions of law prepared by George W. Weaver, attorney for Velma Wood and Esther Campbell. From this ruling, Gene Jacks and Joan Jacks Brogdon appeal, raising the following issue:

> **THE CHANCERY COURT ERRED IN FINDING THAT FREDDY GENE JACKS AND JOAN JACKS BROGDON ARE NOT THE BIOLOGICAL CHILDREN OF HULLY GRUBBS.**

### STANDARD OF REVIEW

¶7. This Court will not disturb findings of fact made by a chancellor unless those findings are manifestly wrong or clearly erroneous. *Bank of Mississippi v. Hollingsworth*, 609 So. 2d 422, 424 (Miss. 1992) (citing *Smith v. Dorsey*, 599 So. 2d 529 (Miss.1992); *Bowers Window & Door Co. v. Dearman*, 549 So. 2d 1309 (Miss.1989)). This Court must affirm a chancellor on a question of fact unless, upon review of the record, it is "left with the firm and definite view that a mistake has been made." *Rice Researchers, Inc.*

***v. Hiter***, 512 So. 2d 1259, 1264 (Miss. 1987) (citations omitted). The factual findings of a chancellor will be affirmed if this Court finds substantial evidence supporting the findings. ***Brooks v. Brooks***, 652 So. 2d 1113, 1117-18 (Miss. 1995) (citing ***Lenoir v. Lenoir***, 611 So. 2d 200, 203 (Miss.1992); ***Tedford v. Dempsey***, 437 So. 2d 410, 417 (Miss.1983)).

¶8. Unfortunately, in the case sub judice, the chancellor failed to make his own findings of fact and conclusions of law. Rather, the chancellor adopted, verbatim, the findings of fact and conclusions of law prepared by George Weaver, attorney for Velma Woods and Esther Campbell. This Court has explained that such findings "are not the same as findings independently made by the trial judge after impartially and judiciously sifting through the conflicts and nuances of the trial testimony and exhibits." ***Rice Researchers***, 512 So. 2d at 1265. Where the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care, and the evidence is subjected to heightened scrutiny. ***Brooks*** at 1118 (citing ***Omnibank of Mantee v. United S. Bank***, 607 So. 2d 76, 83 (Miss.1992); ***In re Estate of Ford***, 552 So. 2d 1065, 1068 (Miss.1989)).

¶9. The Appellants submit that this Court should review this matter de novo. While, as noted above, the deference normally afforded the chancellor's findings of fact is lessened, this Court will not review this case de novo. As this Court explained in ***Rice Researchers***, though the deference afforded the findings of fact is lessened, where the chancellor is of the view that, over all, the Appellees had "the better of the battle . . ., [t]hat determination is entitled to deference, though sensibly not as much as in the ordinary case." ***Rice Researchers*** at 1265. This Court must view the challenged findings and the record as a whole "with a more critical eye to ensure that the trial court has adequately performed its judicial function." ***Id.*** (citations omitted).

¶10. The Appellants also argue that this Court should utilize a de novo standard of review because the chancellor erroneously applied an incorrect legal standard. Where an action is brought to establish paternity and the putative father is deceased at the time of the action, paternity must be proven by clear and convincing evidence. Miss. Code Ann. § 91-1-15(3)(c) (1994). Where a lower court misperceives the correct legal standard to be applied, this Court will not give deference to the findings of the lower court, but instead reviews questions of law de novo. ***Brooks*** at 1117 (citing ***Bean v. Broussard***, 587 So. 2d 908 (Miss. 1991); ***Bank of Mississippi v. Hollingsworth***, 609 So. 2d 422, 424 (Miss. 1992)).

¶11. The Appellants assert that the following statement made by the chancellor in his opinion demonstrates that the chancellor applied an incorrect legal standard:

> The Court finds that, in order for Plaintiffs, F. Gene Jacks and F. Joan Jacks Brogdon, to meet their burden of proof by clear and convincing evidence, the social evidence will, of necessity, have to be substantially higher than fifty percent prior probability assigned by Dr. Sinha and agreed to by Dr. Bever and approved by the American Association of Blood Banks.

The chancellor's statement, though confusing because of its unfortunate use of language often employed in describing various quanta of proof, does not demonstrate that the chancellor employed a different standard of proof than that required by § 91-1-15(3)(c). The Appellants take the statement out of context. The statement is found at the close of the chancellor's discussion of his findings of fact regarding the genetic evidence presented by the parties and just prior to his discussion of social or non-genetic evidence presented by the parties. The chancellor, in his discussion of genetic evidence, noted that in arriving at the percentages representing the probability that Hully Grubbs was the father of the Appellants, the Appellants'

expert used a prior probability standard of fifty percent. As the experts explained, the prior probability standard depends upon the likelihood of "sexual access" between the mother and putative father. The fifty percent probability standard is the percentage recommended by the American Association of Blood Banks as being "neutral," that is, it does not take into account whether there was a high likelihood of sexual access or a low likelihood of access. The higher the prior probability standard, the higher the percentage representing the probability of paternity will be, and vice versa. For example, if the prior probability standard in the case at hand were dropped from fifty percent to thirty percent, the 83.7% probability of paternity assigned to Gene Jacks would drop to 68.5%. Dr. Robert Bever, expert for the Appellees, stated that the prior probability standard varies with the social evidence and that a standard of fifty percent does not take into account any social evidence. Dr. Bever explained that the final probability of paternity may fluctuate when the trier of fact considers the strength or weakness of the non-genetic evidence on likelihood of sexual access.

¶12. This was explained in the chancellor's opinion just prior to the statement relied upon by the Appellants. The chancellor's statement merely indicates that, because he had determined that the 83.7% probability indicated by the genetic evidence is not, in and of itself, clear and convincing proof of paternity, the social evidence would have to be strong enough to cure the deficiency, to increase the prior probability standard. The chancellor then discussed the social evidence of the Appellants, which he found lacking. Even in the statement relied upon by the Appellants, the chancellor recognized that the requisite standard is clear and convincing evidence, as he did at the beginning of the opinion, prior to any discussion of fact, when he stated, "the Court being ever cognizant that their heavy burden of proof as required by Section 91-1-15(c)(3) is clear and convincing evidence."

¶13. Because the chancellor applied the correct legal standard to the evidence presented by the Appellants, this Court will not engage in a de novo review of this case. Nevertheless, due to the chancellor's failure to make his own findings of fact and conclusions of law, this Court will confront Appellants' assignments of error with its sensitivity to the possibility of error heightened.


## DISCUSSION

### THE CHANCERY COURT ERRED IN FINDING THAT FREDDY GENE JACKS AND JOAN JACKS BROGDON ARE NOT THE BIOLOGICAL CHILDREN OF HULLY GRUBBS.

¶14. The Appellants argue that the chancery court erred in finding that they are not the biological children of Hully Grubbs. Where the putative father is deceased at the time of an action to establish paternity, the claimant must offer clear and convincing proof of paternity. Miss. Code Ann. § 91-1-15(3)(c) (1994). The requisite standard of clear and convincing evidence reflects the high degree of confidence society demands in adjudications of paternity. *In re Estate of Ford*, 552 So. 2d 1065, 1067 (Miss. 1989). The standard serves "[t]he interests of legitimate heirs, and of society as a whole, in averting fraudulent claims." *Id.*

¶15. The Appellants contend that the results of the genetic testing are so compelling as to satisfy the standard of clear and convincing evidence and that even the social evidence alone is conclusive proof that Hully Grubbs is the father of the Appellants. As the Appellants submit, the findings of fact adopted by the

chancellor were less than objective, and even in a few minor instances, misstated. Nevertheless, even with the errors from the chancellor's opinion removed, there still exists substantial evidence to support his holding. The evidence offered by the Appellants can best be characterized as sixty years of rumor and gossip, plus the results of genetic testing. Though there certainly was conflicting evidence, it cannot be said that the Appellants established paternity by clear and convincing evidence. The chancellor's findings withstand even our heightened scrutiny here.

## THE EVIDENCE PRESENTED

### Genetic Evidence

¶16. By agreement of the parties, the body of Hully Grubbs was exhumed, and samples were collected and submitted to two independent testing laboratories, GenTest of New Orleans, Louisiana, and Genetic Design of Greensboro, North Carolina. The genetic evidence was presented at trial by, Dr. Sudhir Sinha, expert for the Appellants, and Dr. Robert Bever, expert for the Appellees. Dr. Sinha was responsible for the testing at GenTest, and Dr. Bever was responsible for the testing at Genetic Design.

¶17. Dr. Sinha performed a PCR Test (Preliminary Chain Reaction Test). Dr. Sinha testified that using a fifty percent prior probability standard, the probability of paternity with regard to Gene Jacks is 83.7%, and the probability with regard to Joan Jacks is 71.97%. As stated above, the experts explained that the prior probability standard depends upon the likelihood of "sexual access" between the mother and putative father. The fifty percent probability standard is the percentage recommended by the American Association of Blood Banks as being "neutral," that is, it does not take into account whether there was a high likelihood of sexual access or a low likelihood of access.

¶18. Dr. Bever testified that the tests run by his laboratory were inconclusive and yielded no results. Dr. Bever stated that his lab did not run the tests performed by Dr. Sinha because the tests run by Dr. Sinha "are not informative for paternity." Dr. Bever explained to the court the effect of non-genetic evidence on the probability of paternity. He explained that if the non-genetic evidence as to whether the putative father actually had sexual access to the mother was weak, the probability of paternity would drop. Dr. Bever stated, "I'm trying to show how this test . . ., if you cannot exclude, it's, basically, a very weak piece of evidence, with regards to saying that the man is the father of these children." The following chart, admitted into evidence, reflects possible fluctuations in the mathematical probabilities from the strength or weakness of non-genetic evidence:

### F. Gene Jacks
### (Combined Paternity Index of 5.14)

| Prior Probability (Non-Genetic Evidence) | Probability of Paternity | |
|---|---|---|
| | 0 (No access) | 0% |
| | .1 (Very weak proof of access) | 36% |
| | .3 | 68.5% |
| | .5 (Neutral) | 83.7% |
| | .9 | 97.88% |
| | 1.0 (Absolute proof of one man only during period of conception) | 100% |

### F. Joan Jacks Brogdon
### (Combined Paternity Index of 2.57)

| Prior Probability (Non-Genetic Evidence) | Probability of Paternity | |
|---|---|---|
| | 0 (No access) | 0% |
| | .1 (Very weak proof of access) | 22% |
| | .3 | 52% |
| | .5 (Neutral) | 72% |
| | .9 | 96% |
| | 1.0 (Absolute proof of one man only during period of conception) | 100% |

When asked whether he had an opinion as to whether the results of Dr. Sinha's test are conclusive, Dr. Bever stated that, according to Dr. Sinha's tests, Hully Grubbs cannot be excluded as the biological father of the twins, but that the tests are inconclusive, with regards to coming to a final conclusion of paternity.

### Social or Non-Genetic Evidence

¶19. Again, the non-genetic evidence offered by the Appellants can best be described as sixty years of rumor and gossip. The only witnesses who were contemporaries of the events surrounding the birth of the twins were Velma Wood, the sister of Hully Grubbs, and Lottie Grubbs, the sister-in-law of Hully Grubbs. All other witnesses testified merely of sixty-year-old hearsay.

¶20. Velma Wood, sister of Hully Grubbs, testified by deposition, the parties having stipulated to her

unavailability. At the time of her deposition, Wood was ninety-three years old and in a nursing home. Velma Wood is the only witness with personal knowledge of the events to which she testified. Wood testified that Hully Grubbs showed her the letter he received from Mattie Jacks demanding money. She testified that when Hully showed her the letter, he said "ain't a word of that so" and that he repeatedly stated he "wasn't in that." She stated that four other men received like letters, and that the men met and discussed the letter. She testified that Hully never told her that he asked Mattie Jacks to marry him and that she did not know whether Hully gave Mattie Jacks any money. Wood testified that Hully Grubbs told her he had never had any children. She stated that she never believed Hully was the father of the twins and that she never told anyone that Hully was the father.

¶21. The Appellants offered the testimony of Polly Childress, a neighbor of Velma Wood and employee of the bank where the bulk of Hully Grubbs's estate is held, who testified that it was "community knowledge" that Hully Grubbs was the father of the twins. Childress testified that Velma Wood told her that Hully had asked Mattie Jacks to marry him, but that Mattie did not want to get married. Childress testified that she did not hear about the letter from Mattie Jacks to Hully Grubbs until just prior to the Appellants' commencing the paternity action and that Velma Wood never discussed the letter with her. Childress stated that she had never heard anything of other putative fathers. She also stated that the mannerisms of Joan Jacks are similar to those of Esther Campbell, Hully Grubbs's sister.

¶22. On cross-examination, Childress admitted that the Sheriff had been forced to get involved in a "feud" between Childress and Velma Wood, but she denied that there is "bad blood" between Velma Wood and herself. The credibility of Childress's testimony was also questioned when Martha Tolbert, daughter of Velma Wood, testified that there has been personal animosity between Polly Childress and Velma Wood for several years.

¶23. The Appellants also offered the testimony of Barbara Nail, another long-time resident of Stewart, Mississippi, and intimate friend of Polly Childress, who testified that it is common knowledge among members of the community that the twins were Hully's children. She stated that Velma Wood told her that Hully Grubbs had two children by Mattie Jacks, that Mattie Jacks sent a letter to Hully stating she was pregnant, and that Mattie Jacks refused Hully's offer of marriage. This testimony directly contradicts that of Velma Wood, who stated she never told anyone Hully was the father of the twins. Nail testified that Velma Wood never mentioned any other possible fathers, but qualified that testimony by stating, "But, you will have to remember, that I was just a small child, when these children were born. And how would I know? That was just gossip, hearsay."

¶24. The credibility of Nail's testimony was questioned by the testimony of Larry Wood, son of Velma Wood, who testified that there is personal animosity between Barbara Nail and his family stemming from an incident in which Barbara's grandson shot Larry's son with a pellet gun. Larry Wood also testified that Hully never mentioned that he had any children.

¶25. Faye Johnson, the niece of Nora Jacks, testified that Gene Jacks closely resembles Hully Grubbs. Johnson stated that she had heard all her life that Hully was the twins' father. She stated she gleaned this knowledge from overhearing adult members of the Jacks family whispering over the breakfast table. Johnson testified that Nora Jacks said Mattie Jacks had told her Hully Grubbs was the father. She testified she had heard Mattie Jacks had many boyfriends, but that she had not heard until recently of the other four letters.

¶26. Lynn Harrell, also a niece of Nora Jacks, testified that she heard, through conversations with her parents, that Hully Grubbs is the father of the twins. Harrell stated she had never heard of any other letters. Harrell testified that she had no personal knowledge of the birth of the twins and that she testified only from facts she heard from someone else within the Jacks family.

¶27. Patsy Wilson, the niece of Mattie Jacks, testified that Gene and Joan resemble Hully Grubbs. Wilson stated that, though she had no personal knowledge of the twins' birth, she grew up believing Hully Grubbs is the father of the twins. She stated she had never discussed the matter with Mattie Jacks. She testified that Hully Grubbs was the only person discussed within the Jacks family as being the potential father of the twins.

¶28. Gene Jacks testified that after Mattie Jacks died, his adoptive mother, Nora Jacks, told him that Hully Grubbs was his father. Gene Jacks stated that Nora Jacks told him at that time that there were rumors that Pete Sumner could be involved, but that Hully Grubbs was his father. He testified that he did not know that Mattie Jacks was his real mother until he was thirty years old and that he had never heard the name of Hully Grubbs until Nora Jacks told him Hully was his father. Gene Jacks stated that Mattie Jacks never discussed the identity of his biological father and never stated that she was his biological mother.

¶29. Gene Jacks stated he did not hear anything more about Hully Grubbs until John Sumner, attorney for the estate and son of Pete Sumner, called him after the death of Hully Grubbs. Gene Jacks testified that during the telephone conversation, John Sumner stated that they could be half-brothers. John Sumner gave a very different account of the telephone conversation in his testimony. Sumner testified that when he called Gene Jacks and stated that he was John Sumner, an attorney in Winona, Gene Jacks stated, "I know who you are and I don't know quite what to say." Sumner testified that he then replied, "Well, a man named Hully Grubbs has died here in Winona - I mean, Kilmichael - and the rumor is, that he might be your father." Sumner testified that Gene Jacks then said, "I thought we had the same father," referring to John Sumner's father, Pete Sumner, who supposedly received one of the letters from Mattie Jacks. Sumner testified that Gene Jacks said, "I know y'all, and I wanted to come by and see you, but I didn't know what you knew." Sumner testified that Gene Jacks gave absolutely no indication that he knew who Hully Grubbs was or that he had ever heard that Hully Grubbs might be his father. John Sumner testified, "They had never heard anything. All they had ever heard was Pete Sumner. . . . He didn't know who Hully Grubbs was."

¶30. Gene Jacks testified that he went to the nursing home to visit Velma Wood and that, during that meeting, she acknowledged that he was Hully's child. Gene Jacks stated that Velma Wood told him that Hully had asked Mattie Jacks to marry him, but that Mattie had refused. He stated that Velma Wood also told him about the other letters. Gene Jacks also testified that Martha Tolbert, Velma Wood's daughter, recognized him as one of Hully's children after Tolbert had met Gene Jacks at the funeral of Mattie Jacks. Tolbert denied ever recognizing Gene Jacks as one of Hully's children.

¶31. On cross-examination, Gene Jacks admitted that he told Martha Tolbert that if they were successful in being named the heirs-at-law of Hully Grubbs, he would give her Hully's house. Gene Jacks stated he made the offer out of kindness and appreciation for Mrs. Tolbert's having cared for Hully after the death of Hully's wife. Gene Jacks also admitted that he made no attempt to find Hully Grubbs during the two-year period of time between finding out Hully was his father and learning from Mr. Sumner that he might receive a share of Hully's estate.

¶32. Lottie Grubbs, sister-in-law of Hully Grubbs, testified that Hully Grubbs never mentioned or

acknowledged any children. Again, Ms. Grubbs and Velma Wood are the only contemporaries of the events surrounding the birth of the twins. Lottie Grubbs stated that she heard from Hully's father about the letter from Mattie Jacks to Hully Grubbs. She stated Hully's father also told them about the four other letters. Lottie Grubbs testified that Gene Jacks resembles Jesse Kilgore. She also stated that Jesse Kilgore had a twin brother. ¶33. Mary Alice Thomas, daughter of Lottie Grubbs, testified that she had known Hully Grubbs all her life and that Hully had never mentioned having any children. She stated on cross-examination that she would inherit part of the estate if the twins were found not to be Hully's children.

¶34. Martha Tolbert, daughter of Velma Wood, was the primary care-giver of Hully Grubbs after the death of his wife in September of 1994. Tolbert testified that on a doctor's visit, the nurse asked Hully Grubbs whether he had any children, and Hully responded "No, I have never had any children." Tolbert stated that she was not aware of the fact that Hully had a relatively large estate until Polly Childress informed her of it just before Hully died. Tolbert stated that Gene Jacks told her that if the DNA results showed that the twins were Hully's children, he would give her Hully's house. She testified that Velma Wood never said the twins were Hully's children, but only that they could have been.

## THE CHANCELLOR'S OPINION

¶35. In regards to the genetic evidence offered by the parties, the chancellor adopted the testimony of Dr. Bever that the results of the testing are inconclusive and discussed the possible fluctuations in the probabilities of paternity based on the strength or weakness of the social evidence. The Appellants find error in the chancellor's failure to regard the genetic evidence as conclusive evidence of paternity and also claim that the chancellor inaccurately depicted the testimony of their expert, Dr. Sinha.

¶36. The Appellants make much of the fact that the chancellor found that they are not the biological children of Hully Grubbs despite the probabilities of paternity assigned by the genetic testing. They contend that the genetic test results satisfy their burden of clear and convincing evidence. Again, the probability with regard to Gene Jacks is 83.7%, and the probability with regard to Joan Jacks is 71.97%.

¶37. Genetic test results are admissible as evidence of paternity, but are not necessarily conclusive. *Chisolm v. Eakes*, 573 So. 2d 764, 767 (Miss. 1990). This Court has stated that the fact finder may consider the expert testimony for what it feels the testimony is worth, and may even discard it entirely. *Id.* Where non-genetic evidence is conflicting, the fact finder must engage in a determination of credibility. *Id.* at 768. Such determinations are for the finder of fact and should not be disturbed on appeal. *Id.* (citing *State v. Hagen*, 382 N.W.2d 556, 559 (Minn.Ct.App. 1986).

¶38. The Appellees rely on this Court's holding in *Chisolm v. Eakes*, 573 So. 2d 764 (Miss. 1990), in arguing that the chancellor's holding was correct despite the genetic evidence in the case at hand. *Chisolm* involved a paternity action brought by the biological mother. The jury found that the defendant was not the father, and the mother appealed, arguing that the verdict of non-paternity was against the overwhelming weight of the evidence and that there was insufficient evidence to support the jury verdict. It should be noted that because the father was still living at the time of the paternity action in *Chisolm*, the burden of proof upon the mother was merely a preponderance of the evidence, not the more demanding clear and convincing standard in the case at hand. *Id.* at 766 (citing *Ivy v. State Dep't of Pub. Welfare*, 449 So. 2d 779, 782 (Miss. 1984)). Testimony concerning the dates of conception was conflicting, and the principal controversy concerned the weight to be given the human leukocyte antigen (HLA) test results showing there was a probability of 99.59649 percent that the defendant was the father. This Court affirmed the jury's

finding, despite the test results, stating that the issue of paternity was for the jury and that to reverse the jury's verdict would disregard the jury's determination of credibility of the witnesses, clearly within the jury's province. *Id.* at 767-69.

¶39. As demonstrated by the facts of *Chisolm*, even blood test results yielding a probability of 99.59649 percent, though admissible as evidence of paternity, are not necessarily conclusive evidence of paternity. In the case at hand, not only was the conclusiveness of the test results called into question by Dr. Bever, expert for the Appellees, there was conflicting non-genetic evidence offered by the parties. As in *Chisolm*, this conflicting evidence called for a credibility determination. The trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. *Rice Researchers*, 512 So. 2d at 1265 (citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)).

¶40. The Appellants are, technically, correct in stating that the chancellor inaccurately depicts the testimony of their expert, Dr. Sinha. Specifically, the chancellor states that Dr. Sinha, the expert for the Appellants, testified that the percentages representing the probability of paternity are "very low." The Appellants claim that the only person who stated the percentages are "very low" was George Weaver, attorney for Velma Wood and Esther Campbell. The reference in the chancellor's opinion to Dr. Sinha's testimony apparently comes from the following exchange between Weaver and Dr. Sinha on cross-examination:

> Q. You have testified that the probability of paternity is very low here, but 83% can't be excluded, though. Would you get on an airplane, with an 83% chance of getting to your destination?
>
> A. The 83% is low, as compared to 99.9%. And that's what we have. If I would have been able to get more DNA, I would have definitely did more tests and looked for 93%. This is a situation, and, as I say, certainly, I would not like to decide on 83%. But, in this particular case, and, I assume, like in every paternity case, there are other evidence, and that's up to not to me to make the decision. I am just giving you, as one of the witnesses, that, based on my test results, all of the DNA markers I tested, matched; and the match power is 83%. That's what I'm saying. Now, whether this proves he is the father or not, I'm not saying that; it's not my decision, and I'm not saying that.

The Appellants are correct in that the chancellor assigns the statement that the probability is "very low" to Dr. Sinha, rather than Weaver. However, regardless of who said the probability is "very low," Dr. Sinha stated immediately thereafter that the probability is low. Though Dr. Sinha did not include the word "very" in his description of the percentages, the chancellor's general depiction of Dr. Sinha's testimony is, nonetheless, accurate.

¶41. After discussing the genetic evidence, the chancellor then went on to find the social evidence insufficient to meet the burden of clear and convincing evidence. The chancellor noted that each side was buttressed by an acknowledged expert, and that neither side had a truly neutral witness. All witnesses were members of either the Jacks family or the Grubbs family, save Polly Childress, Barbara Nail, John Sumner, and the two experts. There was testimony that Polly Childress and Barbara Nail had conflicts with the Grubbs family. Though John Sumner's father allegedly received one of the letters from Mattie Jacks, he apparently had no interest or bias in the matter. Again, the chancellor, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. *Rice Researchers*, 512 So. 2d at 1265 (citing *Hall v. State ex rel. Waller*, 247 Miss. 896, 903, 157 So. 2d 781, 784 (1963)).

¶42. In discussing the testimony of Polly Childress and Barbara Nail, the chancellor found that "the

demeanor of both of these lay witnesses and the obvious dislike for the Wood family, as demonstrated on cross-examination, casts substantial doubt on their truthfulness." Unfortunately, the lack of objectivity attendant upon adopting the findings of fact of a litigant to the action showed through when chancellor noted, "Mrs. Childress admitted that there was substantial bad blood between her and Mary Wood McDonald." As the Appellants note, Polly Childress did not admit there was substantial bad blood between the Wood family and her. On cross-examination, Childress admitted that the Sheriff had been forced to get involved in a "feud" between Childress and Velma Wood, but she denied that there is "bad blood" between Velma Wood and her. It was Martha Tolbert, daughter of Velma Wood, who testified that for several years there has been personal animosity between Childress and Wood.

¶43. Additionally, the chancellor mistakenly stated, "Mrs. Nail did admit that there was animosity between the families of Velma Wood and that of herself, resulting from her grandson having shot the grandson of Velma Wood some years ago, accidentally." Barbara Nail did not testify to animosity between herself and Velma Wood. Rather, Larry Wood, son of Velma Wood, testified that there is personal animosity between Barbara Nail and his family stemming from the incident in which Barbara's grandson shot Larry's son with a pellet gun.

¶44. Though the chancellor's account of the testimony of Polly Childress and Barbara Nail is incorrect, there was certainly testimony presented to the same effect by Martha Tolbert and Larry Wood. The chancellor's determination that the testimony of Polly Childress and Barbara Nail lacked credibility should not be disturbed. The chancellor had evidence before him that the testimony of Polly Childress and Barbara Nail lacked credibility, though the evidence was not elicited from the witness from whom he stated it was elicited.

¶45. The chancellor found that the testimony of Faye Johnson and Lynn Harrell that Gene Jacks resembles Hully Grubbs amounted to no more than speculation. The chancellor noted that neither testified as to any personal knowledge of the events surrounding the birth of the twins and that Lynn Harrell's testimony was based on her having seen Hully Grubbs as a mail carrier many years ago.

¶46. The chancellor found inconsistent the testimony of Patsy Jacks Wilson and Gene Jacks. Wilson testified that the twins told her that Nora Jacks told each of them, prior to their respective marriages, that their father was Hully Grubbs. Gene Jacks testified that Nora Jacks told him that his father was Hully Grubbs just prior to her death in 1993. Furthermore, the chancellor resolved the conflict between Gene Jacks's testimony regarding his telephone conversation with John Sumner and John Sumner's testimony regarding that conversation in favor of John Sumner, who, the chancellor stated, has no pecuniary interest in the case. Again, John Sumner testified that when he called Gene Jacks and stated that he was John Sumner, an attorney in Winona, Gene Jacks stated, "I know who you are and I don't know quite what to say." John Sumner testified that he then replied, "Well, a man named Hully Grubbs has died here in Winona - I mean, Kilmichael - and the rumor is, that he might be your father." John Sumner testified that Gene Jacks then said, "I thought we had the same father," referring to John Sumner's father, Pete Sumner. John Sumner also testified that Gene Jacks made no indication during the conversation that he had any knowledge that Hully Grubbs might be his father or even of who Hully Grubbs was.

¶47. The chancellor noted that Velma Wood and Lottie Grubbs were the only witnesses of sufficient age to have any personal knowledge of the events surrounding the birth of the twins. Both witnesses testified that four men other than Hully Grubbs received a letter from Mattie Jacks and that Hully Grubbs never

acknowledged that he had any children. Velma Wood's testimony that she never told anyone that Hully was the father of the twins is in direct conflict with that of Polly Childress and Barbara Nail, who testified that Velma Wood stated Hully was the father. The chancellor resolved this conflict in favor of Velma Wood.

¶48. The Appellants also find error in the chancellor's discussion of the testimony of Lottie Grubbs. The chancellor states that Lottie Grubbs was made aware, through her husband, the brother of Hully Grubbs, of the letter received by Hully Grubbs and four other men. As the Appellants note, Lottie Grubbs testified that Hully's father had told her of the letters. Technically, when asked who told her about the letters, Lottie Grubbs responded "Mr. Grubbs." Understandably, such a response is confusing in that her father-in-law was Mr. Grubbs, as was her husband. It is only within the context of the questioning regarding the father-in-law's visit to the home of his son and Lottie Grubbs and that it becomes clear she was talking about the father-in-law. The Appellants also find error in the chancellor's statement that Lottie Grubbs testified that the letters contained a request for $500. As the Appellants note, though the witnesses all agree that the letter contained a request for monetary assistance, no witness stated a specific monetary figure.

¶49. The chancellor noted that Larry Wood and Martha Tolbert also testified that Hully Grubbs never acknowledged having any children. The chancellor also found significant Martha Tolbert's testimony that Gene Jacks offered to give her the house if the twins were adjudicated to be the children of Hully Grubbs. However, the chancellor incorrectly stated that Martha Tolbert testified that she construed this offer to be a bribe. Such may have been insinuated in counsel's questions to the witness and certainly could be extrapolated by the fact finder, but Martha Tolbert never stated she interpreted the offer to be a bribe.

¶50. In his conclusions of law, the chancellor gave little weight to the results of the genetic testing, and found insufficient the proof of paternity offered by the Appellants. The chancellor stated that there was absolutely no acknowledgment of paternity by Hully Grubbs through acts, conduct or declarations, and that no evidence suggested acknowledgment by Mattie Jacks that Hully Grubbs was the father. The Appellants argue this is an incorrect finding because Hully Grubbs acknowledged paternity by asking Mattie Jacks to marry him. Specifically, the Appellants argue that Polly Childress and Barbara Nail testified that Velma Wood told them that Hully Grubbs asked Mattie Jacks to marry him. It should be noted that the chancellor discredited the testimony of both Barbara Nail and Polly Childress because of testimony regarding animosity between both women and the Wood family, the intimate friendship between the women, and the inconsistencies in their testimony and the testimony of other witnesses. The Appellants also incorrectly argue that Velma Wood testified in her deposition that Hully asked Mattie Jacks to marry him. That testimony went as follows:

Q. Did Hully ask her to marry him?

A. Well, I don't really know if he asked her that. I think he did. He was the only person that would, you know -

Q. Didn't Hully tell you that he asked her to marry him?

A. He said she didn't want marriage.

Q. Right.

A. He offered her - Well, what are we going to do about it? Well, I don't know.

Q. But Hully did tell you that he asked Mattie to marry him?

A. She just told him she didn't want marriage. She just wanted money.

Q. Mrs. Woods, could you tell me yes or no. Did Hully tell you that he asked Mattie Jacks to marry him?

A. No, he didn't tell me that.

Q. But you're aware that he did ask her?

A. Well, he asked her - I don't really know about that.

Q. Okay. Did Hully ever tell you that he asked her to marry him?

A. No. Every time that anything was said at all, he'd say that it ain't so.

. . . .

Q. Do you know if Hully ever gave Mattie Jacks any money?

A. No, he didn't.

(emphasis added).

¶51. The Appellants insist that it was obvious Velma Wood's testimony was "coached." Wood did state that she had discussed the case with family members, but such does not necessarily mean she was "coached." At the time of the deposition, Wood was ninety-three years old, in a nursing home, and had difficulty hearing. The parties stipulated to her unavailability as testifying at the trial was deemed to be detrimental to her health. Whether the testimony appeared "coached" was a determination of credibility for the chancellor. To this Court, the testimony seems, at most, confused and disoriented.

¶52. The Appellants also assign error to the chancellor's finding that no evidence suggested that Mattie Jacks ever claimed that Hully Grubbs was the father of the twins. The Appellants point to the deposition of Velma Wood in which she stated that she read the letter from Mattie Jacks to Hully in which Mattie requested money. The Appellants assert that this letter was a claim by Mattie Jacks that Hully Grubbs was the father of the twins. The Appellants' point is well-taken, but, by the same token, one could also accept Wood's testimony that four other men received letters as well. Acceptance of such testimony would lead to the conclusion that Mattie Jacks claimed that five men were father to the twins, not just Hully Grubbs. Thus, Mattie's letter to Hully Grubbs might be termed, at best, a claim of possible paternity. Furthermore, even if Mattie's letter were an acknowledgment that Hully Grubbs is the father of the twins, such is certainly not fatal to the chancellor's finding. The fact that Mattie Jacks claimed that Hully was the father of the twins does not necessarily result in the Appellants' having met their burden of proof by clear and convincing evidence.

¶53. The Appellants argue that because the only letter actually seen by a witness was the letter to Hully Grubbs, which was seen and testified about Velma Wood, it was error for the chancellor to believe testimony as to the existence of the other letters of which no witness had personal knowledge. The Appellants forget that their entire case is a house of cards built upon sixty years of hearsay and gossip. It is

inconsistent to argue that the chancellor cannot accept as truthful testimony about the existence of the other letters, but must, at the same time, accept as truthful the testimony of witnesses such as Polly Childress and Barbara Nail as to the "community knowledge" regarding the father of the twins. If the chancellor could accept as truthful only that testimony of which the witness had personal knowledge, the Appellants' sole bit of proof would be the testimony of Velma Wood that Hully Grubbs received a letter from Mattie Jacks stating that she was pregnant and requesting money, plus genetic testing revealing an 83.7% probability of paternity which the chancellor found inconclusive.

¶54. The chancellor concluded by stating that the events surrounding the birth of the twins are in excess of sixty years old. The chancellor again stated that he found no credible evidence of parental acknowledgment by either the biological mother or the alleged father. The chancellor found that Velma Wood, Esther Campbell, and Mary Alice Grubbs Thomas are the sole heirs-at-law of Hully Grubbs.

## CONCLUSION

¶55. The chancellor's determination that the Appellants failed to meet their burden of proof by clear and convincing evidence is affirmed. The chancellor considered both genetic evidence of paternity as well as non-genetic or social evidence. He based his finding that the twins failed to offer clear and convincing evidence of paternity on the testimony of Dr. Bever, genetic expert for the Appellees, as well as the credibility, or lack thereof, of the witnesses. His findings detail the testimony of each witness, and he specifically stated whether and why he found or did not find each witness's testimony credible. The determination of credibility of the witnesses is a question for the chancellor as trier of fact, as is the weight to be given the results of the genetic testing.

¶56. The Appellants present no clear and convincing evidence that the chancellor's ultimate finding should have been otherwise. Certainly, the chancellor's opinion contained errors in the recollection of witness testimony. However, no error was so significant as to alter the chancellor's finding as to the credibility of the witnesses and weight given to the testimony and test results. This Court will not disturb the chancellor's determination that Velma Wood, Esther Campbell, and Mary Alice Grubbs Thomas are the sole heirs-at-law of Hully Grubbs. The judgment of the Montgomery County Chancery Court is affirmed.

¶57. **AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, MILLS, WALLER AND COBB, JJ., CONCUR. PRATHER, C.J., AND McRAE, J., CONCUR IN RESULT ONLY.**