MYERS, P.J.,
for the Court:
¶ 1. In December 2006, Sonja S. Gorden petitioned the Hinds County Chancery Court for a determination of the heirs at law of George H. Kendrick Sr. (Kendrick) who had died intestate in September 2006. Following an heirship hearing, the chancery court determined that Sonja had established by elear-and-convineing evidence that she is the biological daughter of Kendrick. Aggrieved, George H. Kendrick Jr., Cheryl K. Rankin, and Cynthia K. Coleman appeal and argue that the chancery court’s ruling is not supported by clear-and-convincing evidence. Finding that the chancery court’s ruling is supported by sufficient evidence, we affirm.
FACTS
¶2. The appellants are all the children of Kendrick and Bennie Noble, who married in 1956 and later divorced in 1976. Sonja, who was born out of wedlock in May 1956, is the biological daughter of Flossie Phungbun.
¶ 3. Flossie testified at the hearing that she and Kendrick met in the summer of 1955, when the two of them were working at a hospital in Jackson, Mississippi. They became romantically involved and engaged in sexual relations. Flossie said that she had heard “through the grapevine” that Kendrick was also courting Bennie during this period of time. In the fall of 1955, Flossie moved to Chicago, Illinois. She and Kendrick continued to see each other, with Kendrick making at least two trips to Chicago to visit her. Sometime in October or November 1955, Flossie learned that she was pregnant with Sonja. Flossie told the chancery court that Kendrick was the *388 father, and she stated that she did not have sexual relations with anyone other than Kendrick while she and Kendrick were seeing each other. At the behest of Flossie’s mother, who lived in Jackson, Flossie moved back from Chicago in the winter of 1956 to have her baby in Jackson. Flossie did not inform Kendrick of her pregnancy until after she had moved back to Jackson. At this point, Kendrick and Bennie had married.
¶ 4. Sonja testified that she learned Kendrick was her father when she was approximately five years old. She met Kendrick for the first time at the home of Flossie’s parents in the presence of Flossie and Flossie’s mother; according to Sonja, they introduced Kendrick as her father. Sonja and Flossie both testified that Kendrick remained actively involved in Sonja’s life from that point forward until his death in 2006. Sonja said that as a child, she saw Kendrick at least every other weekend. Sonja, who lived with her grandparents in Jackson while Flossie lived in Chicago, stated that Kendrick often would stop by her grandparents’ house to check on her and to give her grandmother money. Sonja said that as she grew older, Kendrick often gave her advice on things such as education and boys. Sonja told the court that when she became engaged to her first husband at the age of seventeen, her grandmother asked Kendrick to talk her out of it. Sonja said Kendrick counseled her, and he told her that her fiancé was not the right man for her, but she did not listen. When her first husband began abusing her, Sonja called Kendrick, who came and got her and let her stay with him for a few weeks. Against Kendrick’s advice, she went back to her husband. A couple of months later, Sonja’s husband threw Sonja off a balcony, which put her in the hospital. Sonja said that while there, Kendrick came to see her and he asked her to leave her husband. Sonja complied, and she stayed with Kendrick for a brief period of time thereafter. With Kendrick’s assistance, Sonja eventually moved to Chicago where Flossie was living.
¶ 5. In 1990, Kendrick and Bennie’s youngest son, Darrell Keith Kendrick, died in a house fire at Kendrick’s house. According to Sonja, Darrell’s death caused Kendrick to go into a deep depression. Out of concern for Kendrick’s well-being, Sonja moved in with Kendrick for another brief period of time afterwards to take care of him.
¶ 6. In 2003, when Sonja married her current husband, Lester Gorden, Kendrick helped pay for the wedding, and he walked Sonja down the aisle. Sonja submitted the wedding program into evidence; the program listed both Kendrick and Flossie as Sonja’s parents.
¶ 7. Lester and his mother, Mattie Gor-den, provided testimony that when they first met Kendrick, Sonja introduced him as her father. According to Lester, when he sought Sonja’s hand in marriage, he asked Kendrick for his permission. Kendrick gave his blessing, and he told Lester to be good to his daughter. According to Mattie, Kendrick told her that he was Sonja’s “daddy.”
¶ 8. Charles Richardson, the pastor who had performed Lester and Sonja’s marriage ceremony, testified that when he met Kendrick for the first time prior to the marriage ceremony, Sonja introduced Kendrick as her father. Richardson said Kendrick gave him no reason to believe that Sonja was not his daughter.
¶ 9. Daniel Lee Hawthorne, a friend and work associate of Kendrick’s, testified that Kendrick told him that Sonja was his daughter. Hawthorne said he grew up in the same neighborhood with Kendrick’s other children, and he told the court that he and Darrell were good friends. Ac *389 cording to Hawthorne, he and Darrell often visited Sonja at her residence, and he said that Darrell often referred to Sonja as his sister.
¶ 10. George Jr., Cheryl, and Cynthia were the only witnesses to testify in dispute of Sonja’s claim. Their testimonies were consistent in that each testified that they had heard rumors over the years that Sonja was their sister, but Kendrick never expressly stated to them that Sonja was his daughter. None of them indicated that Kendrick had ever expressly disclaimed any such relationship. They each acknowledged that Sonja and Kendrick were close, and that Sonja had spent time at Kendrick’s house, but they insisted that Sonja was merely a close friend of his. Each testified about family reunions and other family gatherings they had attended where Sonja was not present. They told the court that Kendrick had an illegitimate son by the name of Gregory Poindexter, who had predeceased Kendrick, but he was the only illegitimate child that Kendrick and Bennie had ever told them about. Each testified that they attended Sonja and Lester’s wedding at Kendrick’s request. Each claimed that they did not notice the wedding program which listed Kendrick as Sonja’s parent. And each indicated that it was not their place to ask Kendrick why he had walked Sonja down the aisle.
¶ 11. The appellants introduced Sonja’s birth certificate into evidence, which contained a blank space where the identity of the father would normally appear. They also introduced Kendrick’s funeral program into evidence, which contained no mention of Sonja. The program contained no mention of Poindexter either.
¶ 12. Prior to the hearing, the parties agreed amongst themselves to have a DNA test conducted, and they jointly made an ore tenus motion with the chancery court requesting an allowance for one, which the chancery court granted. Specimen samples were taken from Sonja, Flossie, and Dayton Kendrick, the brother of Kendrick, at MedScreens, Inc., in Flo-wood, Mississippi. The samples were sent to Genquest DNA Laboratory in Sparks, Nevada, where they were analyzed by Dr. Elmer Otteson. Dr. Otteson’s testimony was thereafter taken by deposition and later submitted into evidence. Based on his analyses of the three samples, Dr. Otteson concluded, on what he indicated was a reasonable degree of scientific certainty, that Sonja and Dayton were “unlikely to be related as uncle [and] niece, with a .7 likelihood.” This outcome was referred to as a “combined kinship index,” and according to Dr. Otteson, it meant that based on the results obtained from the analysis of the DNA profiles from Sonja, Flossie, and Dayton, Sonja’s DNA profile “is 0.7276 times more likely if the alleged uncle [Dayton,] is the true biological uncle as compared to unrelated persons of the Black population (prior probability = 0.5).” Dr. Otteson explained that a combined index of “one,” reveals no genetic evidence for or against kinship; therefore, the weight of the genetic evidence is stronger the further away the combined kinship index is from “one.”
¶ 13. Taking the above testimony and exhibits into consideration under the clear- and-convincing standard required by Mississippi Code Annotated section 91-1-15(3)(c) (Rev.2004), the chancery court concluded that Sonja is Kendrick’s biological daughter. Accordingly, the chancery court found Sonja was entitled to a twenty-five-percent intestate share of Kendrick’s estate.
STANDARD OF REVIEW
¶ 14. We will not disturb the factual findings of a chancellor unless such find- *390 tags are manifestly wrong or clearly erroneous. Estate of Thomas v. Thomas, 883 So.2d 1173, 1176 (¶ 9) (Miss.2004). “If there is substantial evidence to support the chancellor’s findings of fact, those findings must be affirmed.” Id.
DISCUSSION
¶ 15. As the appellants correctly point out, Sonja had the burden in this case of proving that Kendrick was her natural father by clear-and-convincing evidence. Estate of Robinson v. Gusta, 540 So.2d 30, 33 (Miss.1989) (citing Miss.Code Ann. § 91 — 1—15(3)(c) (Supp.1988)). “Where the putative father is deceased at the time of an action to establish paternity, the claimant must offer clear and convincing proof of paternity.” In re Estate of Grubbs, 753 So.2d 1043, 1048 (¶ 14) (Miss. 2000). This standard reflects the high degree of confidence society demands in such adjudications. Id. And it “serves the interests of legitimate heirs, and of society as a whole, in averting fraudulent claims.” Id. (internal quotations omitted).
¶ 16. The appellants contend that Sonja failed to meet her burden; thus, the chancery court erred in its decision. Citing Woods, 753 So.2d at 1049 (¶ 19), the appellants submit that Sonja’s claim is supported merely by “rumor and gossip.” And they argue that when Sonja’s evidence is taken into consideration along with the compelling DNA results submitted in this case, it cannot be said that Sonja established by clear-and-convincing proof that Kendrick was her natural father.
¶ 17. We disagree. Based on our review of the record, Sonja presented evidence beyond mere rumor and gossip, if believed by the chancellor to be credible, to establish that Kendrick was her natural father. Distinguishable from Woods, the chancellor in this case had before him a witness with personal knowledge of the circumstances surrounding Sonja’s birth. Sonja’s mother, Flossie, provided uncon-troverted testimony that she had engaged in sexual relations exclusively with Kendrick at the time Sonja was conceived. Flossie did not list Kendrick, or anyone else, as the father on Sonja’s birth certificate, but she testified that she told Kendrick that he was Sonja’s father. The evidence further revealed that Kendrick thereafter openly acknowledged and treated Sonja as his natural daughter, as exhibited by the declarations he made to others outside the family and by the fatherly conduct he bestowed on Sonja from the time she was a young girl. No evidence was presented that Kendrick had ever expressly disclaimed Sonja as his daughter. Cf. Thomas v. Thomas, 200 Miss. 96, 102, 25 So.2d 710, 711 (1946).
¶ 18. In Gusta, the supreme court affirmed the chancery court’s ruling in favor of an illegitimate child’s claim that he was the natural son of the decedent, based on similar factual findings. There, the claimant presented evidence of an “intimate, sexual relationship” between the decedent and the claimant’s mother during the nine-month period of time before the claimant’s birth, and there was no indication that the claimant’s mother had sexual relations with any other male during that period of time. Gusta, 540 So.2d at 34. The claimant also presented evidence of “implied acknowledgments” by the decedent of the fact of paternity, such as the decedent’s income-tax returns and food-stamp applications. Id. According to the Gusta court, this limited evidence was “of sufficient quantity and quality that a rational trier of fact could have concluded that [the claimant] had proved by clear[-]and[-]eonvincing evidence that [the decedent] was his natural father.” Id.
*391 ¶ 19. Likewise, we find that the evidence presented by Sonja provided a substantial basis upon which the chancellor could have based his decision.
¶ 20. With regard to the DNA results, the record reveals that the chancellor took this information into consideration, but ultimately found the results inconclusive on the issue of paternity. We find no error with the chancellor’s findings.
¶ 21. In his deposition, Dr. Otteson acknowledged that there are problems with the type of test that was conducted in this case. He stated that the test was conducted on the premise that Dayton and Kendrick, as “full-blooded brothers,” shared a lot of the same genes. But he also explained that such a probability can vary, and there was no way of knowing to what extent in this instance. In short, Dr. Otte-son indicated that while the test results revealed that it was unlikely that Sonja and Dayton are related as uncle and niece, the results were nonetheless inconclusive as to whether Sonja is Kendrick’s biological daughter.
¶ 22. In Woods, the chancery court permitted genetic test results into evidence in a heirship proceeding for its consideration on the question of paternity involving a putative father who was deceased. By agreement of the parties in that case, the deceased’s body had been exhumed, and DNA samples were collected and then tested along with the DNA samples taken from the petitioners, who were fraternal twins. Woods, 753 So.2d at 1048 (¶ 16). Two independent DNA laboratories conducted the tests. Id. at 1048-49 (¶ 17). One of the labs determined that the test results were inconclusive. Id. at 1049 (¶ 18). The other lab determined that the probability of paternity with regard to the male twin was 83.7%, and the probability of paternity with regard to the female twin was 71.97%. Id. at 1048-49 (¶17). The chancery court found the results inconclusive. Id. at 1052 (¶35). On appeal, the supreme court held that the weight to be given to such evidence was for the chancellor sitting as trier of fact to determine and, thus, found no error. Id. at 1056 (¶ 55). Citing to Chisolm v. Eakes, 573 So.2d 764, 767 (Miss.1990), a case which involved a paternity action against an alleged putative father who was still living, the Woods court opined as follows:
Genetic test results are admissible as evidence of paternity, but are not necessarily conclusive. [Chisolm, 573 So.2d at 767]. This Court has stated that the fact finder may consider the expert testimony for what it feels the testimony is worth, and may even discard it entirely. Id.
Woods, at 1052 (¶ 37).
¶ 23. Here, the appellants have failed to show any error on the part of the chancery court in its determination that Sonja is the natural daughter of Kendrick. Therefore, we affirm the court’s judgment.
¶ 24. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR.