340 So.2d 722 (1976)
Georgie B. DIXON et al.
v.
Pearl Lee CURTIS et al.
No. 48948.
Supreme Court of Mississippi.
November 30, 1976.
Rehearing Denied January 12, 1977.
*723 Singley, Minniece, Hamilton, Neville & Hamill, Thomas Y. Minniece, Meridian, for appellants.
Brunini, Grantham, Grower & Hewes, Jackson, Riddell & Dabbs, Quitman, R. Gordon Grantham, Jackson, Tally D. Riddell, Quitman, for appellees.
Before GILLESPIE, C.J., and SUGG and BROOM, JJ.
GILLESPIE, Chief Justice, for the Court.
This appeal involves two separate cases and is a sequel to Keeler v. Boteler, 267 So.2d 319 (Miss. 1972).
The two cases, one involving a contest of the alleged will of Anna Belle Burnett, and the other involving the heirship of Granville Barnett, a/k/a Earl Burnett, were tried together in the Chancery Court of Clarke County, Mississippi. Georgie B. Dixon and her grantees were the successful litigants in Keeler and the unsuccessful litigants in the two cases now under consideration.
In Keeler, Georgie B. Dixon was adjudged the sole heir of Anna Belle Burnett, who was adjudged the sole heir of Granville Barnett, a/k/a Earl Burnett, and she and her grantees were adjudged the owners of a 29/30th interest in and to a parcel of land in Clarke County, Mississippi.
Before this Court's affirmance of the decree in Keeler, and on June 29, 1972, Pearl Lee Curtis, Mildred C. House and Myrtle Dilworth, who were not parties to Keeler, and their grantees filed suit against Georgie B. Dixon and her grantees averring that Pearl Lee Curtis was the daughter of Granville Barnett, a/k/a Earl Burnett, hereinafter Earl Burnett, and, together with Burnett's widow, Anna Belle Burnett, were the sole heirs of Earl Burnett, deceased; that Mildred C. House and Myrtle Dilworth were the sole heirs of Anna Belle Burnett; and that Georgie B. Dixon was not related to Anna Belle Burnett. The bill of complaint also charged that the decree in Keeler was *724 rendered on false and fraudulent testimony and constituted a fraud on the court. After this last suit was at issue and about two days before it was set for trial, all parties were notified that Georgie B. Dixon had discovered a holographic will of Anna Belle Burnett devising all of her property to Georgie B. Dixon. This will was probated in common form on January 7, 1974. Pearl Lee Curtis, Mildred C. House and Myrtle Dilworth contested the validity of the alleged holographic will, charging that it was a forgery. Thereafter, the trial court declined to consolidate the two causes for trial, but allowed evidence in either cause relevant to and admissible in the other cause to be considered by the court in reaching its decision in either or both cases.
After a lengthy hearing, the court entered a decree adjudging that the purported will of Anna Belle Burnett was a forgery. In the heirship case, the court set aside the former decree (involved in Keeler) on the ground that it was based on false and fraudulent testimony and evidence constituting a fraud perpetrated upon the court, and held that Earl Burnett died intestate and left as his joint heirs his widow, Anna Belle Burnett, and his daughter, Pearl Lee Curtis, each of whom inherited a one-half interest in the subject property, and at the time of Anna Belle Burnett's death she left as her joint heirs her two first cousins, Mildred C. House and Myrtle Dilworth, each of whom inherited a one-fourth interest in the subject property.

THE WILL CASE
Georgie B. Dixon, as proponent of the purported holographic will of Anna Belle Burnett, according to the terms of which Georgie B. Dixon was the sole devisee of Anna Belle Burnett, offered the proceedings wherein the will was probated in common form, and rested.
Georgie B. Dixon was called as an adverse witness and testified that she found the purported will in Anna Belle Burnett's Bible and that this Bible was in a trunk containing the effects of Anna Belle Burnett.
The proof showed that for many years Georgie B. Dixon and Anna Belle Burnett had lived together. This trunk and its contents had been in the possession of Georgie B. Dixon about five or six years before the will was found. The contestants offered the testimony of Lucille P. Lacy of Houston, Texas, who qualified as an examiner of questioned documents. She testified that the person who wrote the will was not the same person who wrote the various stipulated samples of Anna Belle Burnett's writing. She testified that the person who wrote Anna Belle Burnett's name on the flyleaf of the Bible also wrote and signed the will.
Donald Doud of Chicago, Illinois, was qualified as an examiner of questioned documents, and he testified that the person who wrote the holographic will was not the same as the person who wrote the stipulated samples of Anna Belle Burnett's writing. He testified that the same person who wrote "Anna Belle Burnett" on the flyleaf of the Bible was the same person who wrote the will. Doud also testified that an examination of the Bible showed that the page preceding the flyleaf containing Anna Belle Burnett's purported signature had been removed and there were indentations on the page containing Anna Belle Burnett's signature, indicating that someone had written on the missing page but he could not determine what had been written on the missing page.
There was a great deal of other testimony offered pro and con on the question of the validity of the will. Bessie Blocker, who lived next door to Anna Belle Burnett and had known her since 1937, testified that she gave the Bible in question to Anna Belle Burnett and saw Anna Belle write her name on the flyleaf. C.D. Brooks of Birmingham, Alabama, was qualified as a specialist in questioned documents, and he was of the opinion that the person who wrote the will also wrote the stipulated samples. He also testified that the person who wrote the signature of Anna Belle Burnett in the Bible also wrote the stipulated samples and the holographic will.
*725 The will case raises two questions.
1. Was the chancellor's finding that the will was a forgery against the overwhelming weight of the testimony?
Appellants have analyzed in great detail the testimony of the two experts who testified on behalf of the contestants. We have carefully examined appellants' arguments but we are unable to say that the chancellor erred in finding that the will was a forgery. It is true that because Georgie B. Dixon had lived with Anna Belle Burnett for many years prior to the latter's death and had referred to Anna Belle Burnett as her aunt, Georgie B. Dixon probably would have been the natural object of Anna Belle Burnett's bounty. It was also shown that several investigators had talked to Georgie B. Dixon over a period of five or six years, searching for information concerning the heirship of Earl Burnett and Anna Belle Burnett. The chancellor had a right to take into consideration the probability that the will, which consisted of one sheet of tablet paper and was said to have been found in Anna Belle Burnett's Bible, would have been found at an earlier date. The chancellor was also justified in believing the testimony of the two experts who testified for the contestants and in rejecting the testimony of the expert who testified for Georgie B. Dixon. No good purpose would be served by a delineation of the extensive testimony offered pro and con on the issue of whether the will was a forgery. In our opinion, this was a question of fact for the chancellor's decision and we find no reason to substitute our judgment for the trier of facts.
2. Did the chancellor err in allowing the adverse examination and impeachment of Georgie B. Dixon on the issue of her blood relationship to Anna Belle Burnett, her marital status, and in permitting appellees to contradict such testimony?
The contestants called Georgie B. Dixon as an adverse witness and cross-examined her at length concerning her present and past testimony as to her blood relationship to Anna Belle Burnett, exposing her previous false testimony that she had married Will Dixon, and where she lived and went to school. This cross-examination and the impeachment testimony was sufficient to justify the chancellor in finding that Georgie B. Dixon was not related by blood to Anna Belle Burnett.
The will case and the heirship case were tried together but were not consolidated and the court entered separate decrees. Prior to the beginning of the trial, the court entered an order declining to consolidate for trial the two cases in the sense that causes are generally consolidated, but decreed:
However, the court recognizes that some of the evidence and testimony introduced in one of the above causes will be material and relevant to and admissible in the other cause. Such evidence and testimony introduced in either cause by any party that is material and relevant to and admissible in the other cause, may on motion be introduced in the other cause by reference and may be considered by the court in reaching its decision in either or both causes.
The order also provided that counsel for all parties agreed to its provisions. The testimony in the two cases cannot from a practical standpoint be separated.
Georgie B. Dixon was cross-examined and impeached with the use of documentary evidence. Mississippi Code Annotated section 13-1-53 (1972) provides as follows:
A party to a suit desiring to examine any opposite party in open court, may, without first taking his deposition, have such party subpoenaed as a witness and examine him in the presence of the court during the progress of the trial, and shall be at liberty to contradict the testimony of such party as he might do with an adverse witness. Such opposite party shall be entitled to fees as a witness for the party by whom he was subpoenaed, such fees to be paid and taxed as in case of other witnesses.
This statute authorizes the cross-examination and impeachment of an opposite party called as an adverse witness to the *726 same extent that any adverse witness may be cross-examined and impeached. Wagley v. Colonial Baking Co., 208 Miss. 815, 45 So.2d 717 (1950).
Dixon argues that the trial court went too far in permitting her impeachment by showing prior contradictory testimony when the only effect was to impeach and not to give any material evidence upon the issues in the case.
The impeachment of Dixon was material to the issue of heirship. It was material on the question of whether the previous decree was obtained by fraud. The parties agreed in advance of trial that the evidence would be introduced in the manner stated in the pretrial decree. Conceding that some of the impeachment was not material to the validity of the will, we cannot say it was not material to the heirship issue. We have carefully considered the effect the impeachment of Dixon on the heirship issue may have had on the chancellor in deciding that the will was a forgery. At least some of the impeachment could be relevant to the forgery question. It would be difficult and would serve no purpose to separate the part that is clearly immaterial on the forgery issue. But the manner in which the two cases were tried together, the rule that the chancellor has considerable discretion in matters of evidence and the chancellor's opinion in the will case  all these considerations lead this Court to the conclusion that the case should not be reversed on this evidence question.
The following is the chancellor's opinion on the forgery issue:
The Court always feels presumptuous when it is called upon to determine whether or not facts are true, when there is certainly a dispute as to testimony, lay and professional. This Court must very frankly admit that I would doubt seriously that this Court would give much credence to anything, any testimony or any evidence, presented by Georgie B. Dixon based on all the facts that are before this Court. The Court, of course, quite logically would look with suspicion on the will brought forward at the time that it was and with the explanation given for this will, but regardless of all that, the Court must consider carefully the professional testimony of the experts that was given here, and this Court very frankly states that it has had several cases where professional handwriting experts have testified, and this Court and all of us know that many times they differ, and, certainly in a case of this kind when you have some on both sides, they are not going to agree or they wouldn't be here; but I am compelled by the testimony of the experts to hold that this will is a forgery. I am convinced, and I am no handwriting expert, that it is a forgery, just from my personal examination of it and the exemplars, but the two witnesses who testified on behalf of the contestants prove conclusively, in this Court's opinion, that the will was a forgery, and I so hold.
It will be noted that the chancellor candidly stated that he would seriously doubt any testimony given by Georgie B. Dixon, but he carefully pointed out that he decided the case upon the testimony of the experts and his own examination of the will and the exemplars. We are of the opinion that the chancellor had a right to look with suspicion upon a will brought forward at the time and under the circumstances testified to by Georgie B. Dixon when she was called as an adverse witness. We are convinced that under all of the circumstances the chancellor decided the case on the correct basis.

THE HEIRSHIP OF ANNA BELLE BURNETT
Did the court err in excluding evidence that Pearl Lee Curtis was not the daughter of Earl Burnett?
Pearl Lee Curtis' birth certificate indicates that she was born in Chicago, Illinois, to Elizabeth Fisher on June 11, 1925, while Elizabeth was still married to Granville Barnett, a/k/a Earl Burnett. Georgie B. Dixon offered the depositions of four witnesses and two affidavits that after the separation of Earl Burnett and Elizabeth *727 Fisher, Burnett lived in Arkansas and did not visit with his wife, Elizabeth Fisher, during the time that Pearl Lee Curtis was conceived.
Assuming without deciding that Georgie B. Dixon had standing to question the legitimacy of Pearl Lee Curtis, as to which, see Graham v. Lee, 204 Miss. 416, 37 So.2d 735 (1948), we think the chancellor's action in excluding the offered testimony was correct. The presumption that a child born in wedlock is a legitimate child is one of the strongest presumptions known to the law, Krohn v. Migues, 274 So.2d 654 (Miss. 1973), and may be rebutted only by proof beyond a reasonable doubt that the husband is not the father. Stone v. Stone, 210 So.2d 672 (Miss. 1968). After fifty years the frail memorials of human memory will rarely be accepted to rebut the presumption of legitimacy arising from documented records of marriage and birth certificate.
We have carefully considered the other arguments raised by Georgie B. Dixon and we find no reversible error. From our study of the case, we find no basis upon which to hold that the chancellor did not reach a correct result.
AFFIRMED.
PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, SUGG, WALKER, BROOM and LEE, JJ., concur.