ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. Prior to his death, James Beasley gave his sister, Ruby Harper, the title to a conversion van and a beneficiary interest in his individual retirement account (IRA).
 
 *313
 
 James’s daughter, Gwen Hill, had been the beneficiary of his IRA. After James died, Gwen discovered that James had named Ruby as the beneficiary of his IRA and sued Ruby. Gwen requested that the Al-corn County Chancery Court set aside James’s conveyances. Gwen also requested that the chancellor enter a judgment against Ruby for the value of the conversion van and the value of the IRA. Alternatively, Gwen requested that the chancellor order Ruby to transfer the title of the van to Gwen. The chancellor denied all of Gwen’s requests. Aggrieved, Gwen appeals.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. This appeal involves a dispute between Gwen, James’s only child, and Ruby, James’s sister and Gwen’s aunt. James’s former girlfriend, Walentyna “Val” Golin-ski, also played a significant role in the events that led to the disputes at issue. Val and James lived together for forty-two years before they split up in April 2006.
 

 ¶ 3. In December 2004, James was diagnosed with cancer. Throughout 2005, James underwent radiation therapy and chemotherapy treatments. Unfortunately, James’s physical health began to deteriorate. James’s mental health also suffered. Testimony indicated that James had been an intelligent and independent person, but he then began to behave uncharacteristically. He often seemed agitated, nervous, or angry. He called 911 approximately ninety times a day and reported that someone was trying to hurt him. He was once discovered undressed in his front yard. He would call both Gwen and Ruby in the middle of the night and ask for help. When either Gwen or Ruby would respond, James would not need any help.
 

 ¶ 4. On April 8, 2006, Val left James. Sixteen days later, an incident at James’s nephew’s home caused local authorities to be summoned. When they arrived, James aimed an unloaded pistol at them. The authorities disarmed James and contacted Gwen. Apparently, Gwen was advised that James would have to be incarcerated unless he received mental health treatment. James, however, adamantly refused to believe that he needed treatment. Later that day, Gwen petitioned the Alcorn County Chancery Court to have James committed and evaluated at the Crossroads Behavioral Unit of the Magnolia Hospital in Corinth, Mississippi. After a three-day evaluation, the chancellor conducted a commitment hearing and ordered that James should be hospitalized in the state mental hospital. James was allowed to remain in Crossroads until space became available at the state mental hospital. The record does not indicate that James was ever transferred to the state mental hospital.
 

 ¶ 5. Dr. Maxie Gordon subsequently diagnosed James with psychotic and bipolar disorders.
 
 [1]
 
 James remained hospitalized
 
 *314
 
 for three weeks. Regarding James’s decision-making capabilities, Dr. Gordon testified as follows:
 

 We assume that individuals who are psychotic lack capacity to understand, you know, financial matters. That was one of the things that I actually put in his initial evaluation, that he had difficulty making financial or personal decisions. But we assume the lack of capacity due to the fact that they are cognitively impaired and they exercise poor judgment and have limited insight. Furthermore, if patients lack capacity, if they are psychotic, they are not allowed to sign themselves into the hospital, either, because we feel like they cannot make an informed decision regarding treatment. Mr. Beasley did not feel that he had an illness and felt that he needed no treatment. So, in my opinion, he did not have capacity.
 

 However, on May 1, 2006, James gave Ruby $910 “to pay bills.” James had the money with him when he was taken into custody on April 24th. When asked whether James “had the mental capacity and judgment to make that decision,” Dr. Gordon responded, “I think he had improved capacity by that time, and that’s certainly a sound decision.”
 

 ¶ 6. James conveyed his van to Ruby while he was hospitalized. That conveyance is one of two disputed conveyances central to this appeal. Trial testimony indicated that, while James was hospitalized, he was concerned that Val’s son or grandson would take a 1999 Chevrolet conversion van from his house because it was titled to James “or” Val. Accordingly, James asked Ruby to bring him the title to the van. Ruby took the title to the hospital, but hospital security would not let her take her purse inside the mental health facility. Ruby’s brother-in-law, J.D. Richardson, folded the title, put it inside his shirt, and took it inside the mental health facility. Testimony indicated that James signed the title at the nurses’ station and transferred the van to Ruby. Testimony also indicated that before James transferred the van to Ruby, he asked Gwen if she wanted the van. According to Gwen’s husband, Mitch Hill, he and Gwen declined to accept the van for two reasons: (1) they did not want anyone to think they were taking advantage of James, and (2) they believed that James only owned half of the van because it was titled to him “or” Val.
 

 ¶ 7. On May 12, 2006, Ruby successfully petitioned the chancery court to have James released into her care despite Dr. Gordon’s opinion that “[tjhere was nothing to make [him] believe that [James] had fully recovered.” Dr. Gordon testified that James “continued to have some low-level psychotic symptoms.” Two days before Ruby petitioned the chancery court, Dr. Gordon’s notes reflected that James continued to behave “bizarre, but less psychotic.” In any event, the chancellor later released James into Ruby’s supervision with instructions that James was to undergo a thirty-day intensive outpatient program, and he was to continue taking his medications.
 
 [2]
 
 On May 15, 2006, James
 
 *315
 
 was released from the hospital and went to live in Ruby’s home.
 

 ¶ 8. Eight weeks after he was released from the hospital, at James’s request, Ruby set up an appointment for James to meet with an attorney regarding a mausoleum that James and Val had arranged to share.
 
 [3]
 
 According to Ruby, Gerald Es-sary, her former brother-in-law, suggested that James meet with attorney Donald Downs. James met with Downs on June 13, 2006. Ruby went with James to his appointment with Downs, and she was present while they met. According to Ruby, during James’s meeting with Downs, James discussed changing the beneficiary of his IRA.
 

 ¶ 9. As previously mentioned, two conveyances are central to this appeal. The second conveyance involves James’s decision to remove Gwen and substitute Ruby as the beneficiary of his IRA. Only Ruby was able to testify as to the specific facts of that transfer, because she was the only person present when James effectuated the change in beneficiaries.
 

 ¶ 10. According to Ruby, after she and James returned to her home after James met with Downs, James spoke with his financial adviser, Winston Way. Ruby dialed Way’s phone number and passed the phone to James. Ruby testified that she simply dialed Way’s number and handed the phone to James. During his conversation with Way, James requested a form to change the beneficiary of his IRA. According to Ruby, she received the form on June 18, 2006. Ruby took the form to James so James could sign it. Again, James was in Ruby’s home at the time, and Ruby was the only person present. Although Gwen had been the beneficiary of James’s IRA for approximately nine years, James removed Gwen as the beneficiary and substituted Ruby. Ruby then took the form from James and sent it back to Way by overnight delivery.
 

 ¶ 11. On August 31, 2006, James was hospitalized again. The record is not clear as to why or how long James was hospitalized. However, Ruby testified that James received a pubic catheter that limited his mobility and prohibited him from driving. When James was later released from the hospital, he returned to Ruby’s home.
 

 ¶ 12. According to Ruby, James wanted to leave her house and return to his home because that is where he preferred to be when he passed away. On September 19, 2006, James went home. The next day, Way visited James. During Way’s visit, James executed a power of attorney giving Ruby power of attorney regarding administration of his IRA. After James returned home, his family took turns caring for him. Ruby and her husband, Wallace Harper, stayed with James for three days during the week. James’s and Ruby’s sister, Ann Richardson and her husband, J.D., stayed with James for two days during the week. Gwen and Mitch stayed with James during the weekends. According to Gwen, James never told her that he had removed her as the beneficiary of his IRA. However, James continued to advise Gwen regarding his preference as to how she should divide the proceeds of the IRA between herself and her children.
 

 ¶ 13. James died on October 23, 2006. After James’s death, Gwen discovered that he had removed her as the beneficiary of his IRA. On December 4, 2006, Gwen sued Ruby. On May 15, 2008, the parties went to trial. The chancellor subsequently entered a judgment finding that Ruby had a
 
 *316
 
 confidential relationship with James. Otherwise, the chancellor found as follows:
 

 When a confidential relationship exists and if the court finds that the beneficiary of the confidential relationship, in this case Ruby, had somehow been actively involved in some way with the execution of the van conveyance and the change of beneficiary, the law would raise a presumption of undue influence.
 

 The court finds that Ruby was not so actively involved as to give rise to a presumption of undue influence. James first attempted to convey the van to Gwen. When she refused he conveyed the van to Ruby. Ruby was clearly not the reason James conveyed the van. He conveyed the van because he wanted to prevent his estranged girl friend (or her children) from getting the van. Rather than supporting the idea that he was mentally deranged at the time, his desire to get the van out of his name, shows rationality, albeit of a petty nature.
 

 With respect to the beneficiary form the circumstances are insufficiently suspicious to show any active participation by Ruby. Ruby may have dialed the number to Way, but this act is simply an act. It shows no influence. Ruby testified that she did nothing to encourage James to make the change. Not a single piece of testimony exists to the contrary. There was no proof that Ruby ever made demeaning remarks about Gwen or her family. Nor did Ruby attempt to prevent James from having contact with his extended family. To the contrary she requested Gwen and one of James’[s] other sisters to be involved.
 

 ¶ 14. In conclusion, the chancellor found that “even if there was the presumption of undue influence (which the court did not find) that presumption would have been overcome by the clear and convincing evidence.” Accordingly, the chancellor declined to set aside James’s conveyance of the conversion van and declined to grant Gwen any relief associated with James’s decision to remove her as the beneficiary of his IRA. Gwen appeals.
 

 STANDARD OF REVIEW
 

 ¶ 15. We will not disturb a chancellor’s findings of fact unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard.
 
 Wright v. Roberts,
 
 797 So.2d 992, 997(¶ 14) (Miss.2001). Moreover, we will not reverse the chancellor’s findings if those findings are supported by substantial, credible evidence in the record.
 
 Id.
 

 ANALYSIS
 

 ¶ 16. Gwen claims the chancellor erred when he declined to set aside James’s inter vivos conveyance of his conversion van. Gwen also claims the chancellor erred when he declined to set aside James’s decision to remove her as the beneficiary of his IRA and name Ruby as the beneficiary. According to Gwen, Ruby acquired James’s van and the beneficiary rights to James’s IRA by exerting her influence over him through their confidential relationship.
 

 ¶ 17. “The law in this state on fiduciary or confidential relationships and undue influence is well settled.”
 
 Id.
 
 at 998(¶ 16). “[T]he rules of law are different regarding gifts testamentary and gifts inter vivos where a confidential relationship exists between the testator/grantor and the beneficiary/grantee.”
 
 Madden v. Rhodes,
 
 626 So.2d 608, 618 (Miss.1993). The supreme court elaborated on that distinction and stated as follows:
 

 The prior holdings of this Court indicate a presumption of undue influence only arises in the context of gifts by will
 
 *317
 
 when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will. On the other hand,
 
 with a gift inter vivos, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.
 

 Id.
 
 (emphasis added).
 

 ¶ 18. If a plaintiff can demonstrate the existence of a confidential relationship between a grantor and a defendant grantee, a rebuttable presumption of undue influence arises regarding any inter vivos transactions between the grantor and the defendant grantee.
 
 Wright,
 
 797 So.2d at 998(¶ 21). The chancellor found that James and Ruby had a confidential relationship. Neither Gwen nor Ruby contests that determination. Accordingly, whether James and Ruby had a confidential relationship is not an issue that we may address on appeal.
 

 ¶ 19. “[0]nce the presumption of undue influence has been established, the burden of proof shifts to the beneficiary/grantee to show by clear and convincing evidence that the gift was not the product of undue influence.”
 
 Id.
 
 at (¶ 16). To rebut the presumption of undue influence, Ruby was obligated to prove, by clear and convincing evidence, that: (A) she acted in good faith; (B) James deliberated on his actions, acted knowingly, and understood the consequences of his decisions; and (C) James exhibited independent consent and action.
 
 Id.
 
 at 999(¶ 23).
 

 A. Good Faith
 

 ¶ 20. Ruby submits that she demonstrated by clear and convincing evidence that she acted in good faith. Important factors in determining whether Ruby acted in good faith are:
 

 (a) the determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy or openness given the execution of an instrument.
 

 Id.
 
 at 1000(¶ 24).
 

 ¶ 21. Gwen argues that Ruby initiated the transfer because she and her brother-in-law smuggled the title to the van into the mental health facility where James was hospitalized. However, the evidence can also be construed to support the chancellor’s decision. That is, as noted by the chancellor, the evidence indicated that James initiated the transfer of his conversion van to prevent Val or her family from taking it. James had a reasonable basis for his concern, as Gwen testified that, while James was in the mental health facility, Val “took all household belongings ... she only left him a spoon [and] a fork. She just about wiped him out.” It is noteworthy that James first offered to give the van to Gwen, but she declined to accept it. However, Gwen’s husband testified that Gwen declined to accept the van because she did not want it to appear as though she was taking advantage of her father while he was hospitalized for mental illness, and she was not certain that James had the legal right to transfer the title to the van.
 

 ¶ 22. As for the place of the execution of the title and the people that were present at the time, James transferred the title to the van at a nursing station in a mental health facility.
 
 [4]
 
 James effectuated the
 
 *318
 
 transfer of title in the presence of Ann, J.D., and an unspecified number of nurses. When asked who was present at the time, Ann did not include Ruby. No evidence suggests that James’s transfer of the van was clandestine relative to anyone except Val and Val’s children. Consideration may be defined as “[s]ome right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.” Black’s Law Dictionary 306 (6th ed.1990). Aside from the knowledge that Val could not take it, Ruby did not give James anything in exchange for the van.
 

 ¶ 23. As for the IRA, Ruby testified that James mentioned naming Ruby as the beneficiary of his IRA during an appointment that Ruby set up with Downs. However, according to Ruby, the primary subject of that meeting was the mausoleum that James and Val jointly owned. When James actually took the logistical steps to name Ruby as the beneficiary, it was Ruby who dialed Way’s number and handed the phone to James. Still, it was James who requested the necessary form. Once the form arrived, Ruby took it to James. James effectuated the change in beneficiaries in Ruby’s presence alone, and Ruby placed the form back in overnight mail. No one but Ruby knew that James had removed Gwen as the beneficiary of his IRA and named Ruby as the beneficiary. While there is no evidence that Ruby took precautions to keep James’s decision a secret, James’s decision to change the beneficiary of his IRA cannot realistically be characterized as “open.” There is no evidence that anyone but Ruby knew that James made her the beneficiary of his IRA until after James died. As with the conveyance of the van, Ruby did not give James anything intended to be consideration for being named as the beneficiary of his IRA.
 

 ¶ 24. Because the chancellor found that Ruby and James had a confidential relationship, Ruby bore the burden of proof of rebutting that presumption. She was obligated to do so by clear and convincing evidence. Clear and convincing evidence has been defined as follows:
 

 that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact [-] finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
 

 Moran v. Fairley,
 
 919 So.2d 969, 975(¶ 24) (Miss.Ct.App.2005) (quoting
 
 Travelhost, Inc. v. Blandford,
 
 68 F.3d 958, 960 (5th Cir.1995)). “Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level.”
 
 Id.
 
 (citing
 
 In re C.B.,
 
 574 So.2d 1369, 1375 (Miss.1990)).
 

 ¶ 25. We conclude that the chancellor did not abuse his discretion when he found that Ruby demonstrated by clear and convincing evidence that she acted in good faith relative to James’s transfer of the van. However, we cannot find that the chancellor heard evidence that would enable him to “come to a clear conviction, without hesitancy” of the fact that Ruby acted in good faith when James named her as the beneficiary of his IRA.
 

 B. Full Knowledge and Deliberation of Actions and Consequences of Those Actions
 

 ¶ 26. In considering the second prong under the test to determine whether Ruby rebutted the presumption of undue influence, this Court considers the following factors:
 

 
 *319
 
 (a) [the grantor’s] awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
 

 Wright,
 
 797 So.2d at 1001(¶ 31).
 

 ¶ 27. There was little evidence regarding these factors, but it is reasonable to conclude that James was somewhat aware of his assets. He was concerned that Val or her family might take the van from him. He wanted to modify the ownership status of his mausoleum so he would not have to share it with Val. James had a will, and he did not exclude Gwen from his will.
 
 [5]
 

 ¶ 28. As for whether anyone other than James controlled his finances, Ruby was a signatory on his checking account, and her status as a signatory goes back as far as 1985. Additionally, shortly before James’s death, Ruby had power of attorney for James. Ruby testified that she never exercised her power of attorney.
 

 ¶ 29. Gwen’s testimony indicated that James did not fully comprehend the effect of his decision to modify the beneficiary of his IRA. Gwen testified that, despite having removed Gwen as the beneficiary, James continued to advise her as to how she should manage the IRA and, if she chose to liquidate it, how she should divide the money among herself and her children. Ruby was asked whether it was James’s intent that she receive all of the proceeds of James’s IRA. Ruby answered, “[w]ell, he knew that I could [have all of the proceeds], but that wasn’t his intentions.” Consequently, it is reasonable to conclude that James did not fully understand the effect of modifying the beneficiary of his IRA.
 

 ¶ 30. As mentioned, Ruby bore the burden of rebutting the presumption of undue influence by clear and convincing evidence. Reviewing this factor, there was substantial evidence to support the chancellor’s ultimate conclusion regarding James’s transfer of the van, but based on James’s apparent lack of understanding regarding the effect in changing beneficiaries, there was not substantial evidence to support the chancellor’s ultimate conclusion regarding James’s decision to substitute Ruby for Gwen as the beneficiary of his IRA. Ruby failed to present evidence that could be characterized as “so clear, direct and weighty and convincing as to enable the fact-finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.”
 
 Moran,
 
 919 So.2d at 975(¶ 24).
 

 C. Independent Consent and Action
 

 ¶ 31. Under the third prong of the test to rebut the presumption of undue influence, Ruby was obligated to demonstrate, by clear and convincing evidence, that James exhibited independent consent and action.
 
 Wright,
 
 797 So.2d at 1002(¶ 38). The “best way” to show independent consent and action is to provide advice of (a) a competent person, (b) disconnected from the grantee, and (c) devoted wholly to the grantor/testator’s interests.
 
 Dean v. Kavanaugh,
 
 920 So.2d 528, 537(¶ 46) (Miss.Ct.App.2006).
 

 ¶ 32. There was no testimony that any competent, disconnected person devoted
 
 *320
 
 wholly to James’s interests advised him to transfer the van or name Ruby as the beneficiary of the IRA. Ruby initially testified that Downs advised James to change the beneficiary of his IRA, but she later elaborated that Downs “advised [James], if he wasn’t sure about the beneficiary, that he should change it, if he wanted someone else to be the beneficiary.” Accordingly, Downs did not advise James to change his beneficiary. Downs simply told James that, if he wanted to change his beneficiary, he should go ahead and make the change. Even if we were to consider Downs’s statement as independent advice, Ruby’s testimony alone is insufficient because the supreme court has held that in order to rebut the presumption of undue influence, the recipient of an inter vivos gift must present something more than his or her own self-serving testimony.
 
 See In re Estate of Smith,
 
 827 So.2d 673, 683(¶ 4) (Miss.2002).
 

 ¶ 33. That does not end the analysis, though. “The participation of the beneficiary/grantee, or someone closely related to the beneficiary, arouses suspicious circumstances that negate independent action.”
 
 Dean,
 
 920 So.2d at 537(¶ 46) (quoting H
 
 arris v. Sellers,
 
 446 So.2d 1012, 1015 (Miss.1984)). J.D. took the title into the hospital. James transferred the title at the nurses’ station. Ruby was not present at the time. Regarding the IRA, James apparently independently mentioned naming Ruby as the beneficiary of the IRA during an appointment with an attorney on an unrelated matter.
 
 [6]
 
 Still, Ruby dialed the phone and handed it to James so James could have his financial adviser send him the change of beneficiary form. The form came to Ruby’s house. Ruby took the form to James so James could sign it. After James signed it, Ruby took the form from James. Ruby then sent the form to Way via overnight delivery. As such, there is evidence that Ruby participated in James’s decision to name her as the beneficiary of his IRA. Additionally, even Ruby testified that it was not James’s intent that she receive the entire balance of the proceeds of James’s IRA. It follows that, because there was evidence of Ruby’s participation, that evidence negates independent action. Therefore, we conclude that Ruby failed to present clear and convincing evidence that James exhibited independent consent and action.
 

 CONCLUSION
 

 ¶ 34. Reviewing the evidence relative to the previously-mentioned factors, we find that the chancellor did not err when he concluded that Ruby rebutted the presumption of undue influence over James incident to his transfer of the van. Accordingly, this Court affirms that portion of the chancellor’s decision. However, there was insubstantial evidence to conclude that Ruby clearly and convincingly demonstrated that she acted in good faith regarding James’s decision to name her as the beneficiary of his IRA. Likewise, there was insubstantial evidence to conclude that Ruby presented clear and convincing evidence of James’s full knowledge and deliberation of his action and the consequences of those actions. Finally, Ruby failed to present clear and convincing evidence of James’s independent consent and action. We conclude that the chancellor’s findings were not supported by clear and convincing evidence that Ruby rebutted the presumption of undue influence regarding James’s decision to name her as the beneficiary of his IRA. Accordingly, we reverse
 
 *321
 
 that portion of the chancellor’s judgment. Because we cannot determine the status of the IRA, we are poorly suited to fashion an appropriate remedy. Consequently, we must remand this matter to the chancery court for a hearing to determine the appropriate remedy consistent with this opinion.
 

 ¶ 35. THE JUDGMENT OF THE AL-CORN COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
 

 KING, C.J., LEE, P.J., GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. IRVING, J„ NOT PARTICIPATING.
 

 [1]
 

 . Dr. Gordon's deposition testimony regarding James's condition was that James “appeared to be suffering from a psychotic illness.'' Dr. Gordon went on to testify that James "had mania, meaning he had difficulty sleeping. He had impaired judgment. He was moving at a very fast pace. He had pressured speech, and he had what we call lack of reality testing. He couldn't distinguish between what was reality and what was not.” Dr. Gordon also elaborated on James's diagnosed bipolar disorder as follows:
 

 [b]ipolar is a mood disorder, so [James’s transferring his property] would be consistent with the type of symptoms that he had in the hospital. One of the things is impul-sivity, poor judgment. They tend to do things on an impulse, on the spur. One of the reasons we considered bipolar is one of the things that bipolar patients will do is that they will go out and spend 10, 20 thousand dollars, if they have that much, of course. Usually, they spend it if they don't
 
 *314
 
 have that much. But they’ll spend a lot of money impulsively, or they'll make an impulsive decision. They usually change things that have been in place all of their life.
 

 [2]
 

 . James attended just four days of the prescribed thirty-day program. There was testimony that, to some degree, James's failure to attend the outpatient program was due to the fact that James was hospitalized sometime in June 2006 for complications associated with a blood clot in his left arm. The record is unclear exactly when James was hospitalized, how long he was hospitalized, and when he was discharged. James lost the use of his left arm as a result.
 

 [3]
 

 . Based on his recent history with Val, James did not want to share mausoleum space with her.
 

 [4]
 

 . The location of the transfer appears problematic to some extent, but James's mental state and his capacity at the time are not an issue on appeal.
 

 [5]
 

 . Gwen inherited James’s house.
 

 [6]
 

 . At trial. Downs could not remember whether he and James discussed what Ruby's atlor-ney termed "a brokerage account.”