# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CA-00031-COA

**KRETONIA MARIE JONES**                                      **APPELLANT**

**v.**

**MAE RAINEY BROWN, INDIVIDUALLY AND**                        **APPELLEES**
**AS ADMINISTRATIX OF THE ESTATE OF**
**MANNIE L. BROWN, JR., DECEASED, MAYA**
**BROWN THOMPSON, AND MELICIA RAINEY**
**BROWN**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2024 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | KIMBERLY WALKER NAILOR |
| ATTORNEY FOR APPELLEES: | EUGENE A. PERRIER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/31/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     The Chancery Court of Warren County found that Kretonia Marie Jones failed to prove by clear and convincing evidence that she is an heir of Mannie L. Brown Jr. and that Mae Rainey Brown, Maya Brown Thompson, and Melicia Rainey Brown are the sole heirs at law of Mannie.  Aggrieved, Jones appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.     Mannie died intestate on July 26, 2020. At the time of his death, Mannie was married to Mae Rainey Brown, and they had two children, Maya and Melicia. Mae filed a petition for letters of administration on October 20, 2020, and an order appointing her as administratrix

of Mannie's estate was entered on November 18, 2020. On June 9, 2021, Mae filed a petition to determine Mannie's lawful heirs. In that petition, Mae states that Jones "alleges that she is also a child of [Mannie's], and that she should be served with process pursuant to law to allow her an opportunity to establish her alleged heirship." Mae's petition was set for hearing on October 22, 2021.

¶3.     On September 30, 2021, Jones filed a motion to continue the hearing on Mae's petition to determine heirs and a separate motion for the DNA testing of herself, Maya, and Melicia.  The chancellor continued the petition to determine heirship and set the motion for DNA testing for hearing on November 17, 2021. On November 17, 2021, the hearing on the DNA motion was reset for January 12, 2022. On January 12, the matter was brought before the chancellor for a hearing. Based upon the arguments of counsel for both sides, the chancellor stated that before she would order the parties to submit to DNA testing, Jones must rebut the presumption that Lawrence A. Newton is her father.[1] The hearing on the DNA motion was continued until further order of the court. The motion was reset for hearing on June 3, 2022, and then reset for February 24, 2023. The day before the scheduled hearing, Jones' counsel filed a motion to withdraw the motion because necessary witnesses were unavailable to testify, and a continuance would serve no purpose.[2] The chancellor granted

[1] Documents attached to pleadings show that Jones' mother was married to Newton at the time of Jones' birth and that Newton is listed as her father on her birth certificate. At the hearing, Jones' counsel argued that Jones was entitled to an opportunity to rebut the presumption that Newton is her father.

[2] It was later explained on the record at the hearing on the petition to determine heirship that both Newton and Jones' mother had died during the pendency of the motion.

2

the motion.

¶4.     The hearing on the petition to determine heirs was held on March 24, 2024. The testimony and evidence introduced at the hearing will be discussed in detail below. Both parties submitted trial briefs as ordered by the court in June 2024. The trial court entered its "Memorandum Opinion And Judgment" on December 10, 2024. The chancellor found that Jones had failed to prove by clear and convincing evidence that she is an heir of Mannie L. Brown Jr. and that Mae, Maya, and Melicia are Mannie's sole and only heirs at law. Jones appealed and raises three issues, which we will address separately below.

## STANDARD OF REVIEW

¶5.     In *Pringle v. Shannon* (*In re Estate of Davidson*), 794 So. 2d 261, 264 (¶¶7-8) (Miss. Ct. App. 2001), we explained our standard of review in cases regarding heirship:

> It is well settled that the Court may not disturb the findings of a chancellor unless the chancellor was "manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Goode v. Village of Woodgreen Homeowners Assoc.*, 662 So. 2d 1064, 1070-71 (Miss. 1995); *Tinnin v. First United Bank of Miss.*, 570 So. 2d 1193, 1194 (Miss. 1990). This Court does not hold the authority to interfere with the judgment of the chancellor where there is substantial evidence to support his findings, even where this Court may have found differently in an initial review of the matter. *In re Estate of Harris*, 539 So. 2d 1040, 1043 (Miss. 1989).

> **Where the chancellor is the fact-finder in a case before his court, his findings of fact on contradictory evidence "cannot be disturbed by this Court on appeal unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence**." *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978); *Liddell v. Jones*, 482 So. 2d 1131, 1132 (Miss. 1986). On the other hand, where the chancellor has not made any specific findings of fact, this Court "will proceed on the assumption that [the chancellor] resolved all such fact issues in favor of the appellee." *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990); *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 205 (Miss. 1984); *Goode*, 662 So. 2d at

3

1071.

(Emphasis added).

## ANALYSIS

I.    **Did the chancellor err by requiring Jones to rebut the presumption that Lawrence A. Newton was her father before the court would order DNA testing of the parties?**

¶6.    We must first note that Jones' argument on this issue is directed to the chancellor's ruling at a hearing on Jones' motion for DNA testing. During that hearing, Jones' counsel argued that he could rebut the presumption that Newton is Jones' father. He insisted several times that she be given an opportunity to rebut the presumption. While the chancellor stated that the first step in the process would be for Jones to rebut the presumption before the chancellor would order DNA testing, there was no written order entered to that effect. Instead, there was simply an order entered continuing the hearing on Jones' motion for DNA testing.

¶7.    The presumption of legitimacy was discussed in *Smith v. Bell*, 876 So. 2d 1087, 1091 (¶13) (Miss. Ct. App. 2004), where this Court explained:

> In order for an illegitimate child to inherit from his or her natural father, there must be an adjudication of paternity after the death of the intestate based upon clear and convincing evidence. Miss Code Ann. Sect. 91-1-15(3)(c) (Rev. 1994). However, there is a rebuttable presumption of the legitimacy of a child born during the course of a marriage. [*Perkins v. Thompson* (*In re Est. of Taylor*),] 609 So. 2d 390, 394 (Miss. 1992). "The presumption of legitimacy is one of the strongest known to our law." *Karenina by Vronsky v. Presley*, 526 So. 2d 518, 523 (Miss. 1988). Under the facts of this case, there was therefore a strong, but rebuttable, presumption that James Ross was the biological father of Francis Bell, III. A party challenging legitimacy may prevail if he proves beyond a reasonable doubt that the legal husband of the mother is not, in fact, the biological father. *Baker By Williams v. Williams*, 503 So. 2d 249, 253

4

(Miss. 1987); *Deer v. State Department of Public Welfare*, 518 So. 2d 649, 652 (Miss. 1988); *Dixon v. Curtis*, 340 So. 2d 722, 727 (Miss. 1977).

Because, as noted above, Jones was born while her mother was married to Newton and because Newton is listed on Jones' birth certificate, there is a strong presumption that Newton was Jones' father. Because Jones' counsel advised the court that he had an affidavit from Newton and Jones' mother and other witnesses to rebut the presumption, he argued that he would be able to rebut the presumption. However, counsel argued that even if he does rebut the presumption, that "only gets us halfway home to who is her father." Then he argued the DNA would be the best evidence to show that Mannie was her father. After hearing the argument that Jones could overcome the presumption, the chancellor stated that would be the first step that needed to be taken and advised Jones' counsel to set that matter for hearing.

¶8.     In her brief, Jones cites *In Re Estate of Taylor* for the proposition that she did not have to rebut the presumption of legitimacy before the question of whether she was Mannie's biological child could be reached. However, Jones misconstrues the opinion. *In re Estate of Taylor* and *Smith* support the position that if Jones provided clear and convincing evidence that Mannie was her biological father, that same proof would show that she is not the biological child of Newton. *In Re Est. of Taylor*, 609 So. 2d at 394; *Smith*, 876 So. 2d at 1091 (¶14).

¶9.     In any event, Jones withdrew her motion for DNA testing. Her counsel advised the court that witnesses needed to support the motion were unavailable to testify and that continuing the hearing date would serve no purpose. The case then moved forward on the petition to determine heirship. There is no mention of the presumption of legitimacy in the

chancellor's ruling contained in the "Memorandum Opinion and Judgment." Instead, the chancellor found that Jones had failed to prove by clear and convincing evidence that Mannie was her biological father. This issue is without merit.

**II.** **Did the chancellor err by finding that Jones failed to prove by clear and convincing evidence that she is an heir of Mannie L. Brown Jr.?**

¶10. Under the circumstances that exist in this case, in *Estate of Kendrick v. Gorden*, 46 So. 3d 386, 390 (¶15) (Miss. Ct. App. 2010), this Court set forth the burden of proof that Jones faced in order to establish that Mannie was her natural father:

> "Where the putative father is deceased at the time of an action to establish paternity, the claimant must offer clear and convincing proof of paternity." *In re Estate of Grubbs*, 753 So. 2d 1043, 1048 (¶14) (Miss. 2000). This standard reflects the high degree of confidence society demands in such adjudications. *Id*. And it "serves the interests of legitimate heirs, and of society as a whole, in averting fraudulent claims." *Id*. (internal quotations omitted).

*See also* Miss. Code Ann. § 91-1-15(3) (Rev. 2021). The "clear and convincing proof" standard was also described by this Court in *Hill v. Harper*, 18 So. 3d 310, 318 (¶24) (Miss. Ct. App. 2009), as follows:

> Clear and convincing evidence has been defined as follows:
>
> > that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact[-]finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
>
> *Moran v. Fairley*, 919 So. 2d 969, 975 (¶24) (Miss. Ct. App. 2005) (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 960 (5th Cir. 1995)). "Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level." *Id*. (citing *In re C.B.*,

6

574 So. 2d 1369, 1375 (Miss. 1990)).

¶11.    On March 25, 2024, the chancellor conducted a hearing on the petition to determine heirship. At the hearing, the Estate called Jones adversely as the first witness. Jones testified that her mother was married to Lawrence Albert Newton Jr. at the time of her birth and that Newton is listed as her father on her birth certificate. Jones' birth certificate was admitted into evidence. Jones also identified a "Petition to Determine Paternity and Child Support" that was then admitted into evidence. The petition was filed by the Warren County Department of Public Welfare and sought to have Mannie determined to be Jones' father and that he be ordered to pay child support. The petition was filed on November 13, 1979, just over ten years after Jones was born. Jones acknowledged that this petition was dismissed on March 12, 1982, and a copy of the order of dismissal was entered into evidence.

¶12.    The Estate then called Maya as a witness. Maya testified that Mannie was her father and that Melicia is her sister. Maya told the chancellor that she was not aware of any other heirs that her father might have. Maya told the court that she first met Jones after her father's death, during a visitation in August 2020. Maya said that Jones identified herself as her sister. Maya testified that she had never before been advised that Mannie had any other children, other than her and Melicia. Maya said she had no recollection of meeting Jones at Mannie's mother's funeral in 1990. Maya said she was only fifteen years old at the time, but no one came forward and identified themselves as her sibling. On cross-examination, Maya confirmed that the first time she heard Jones' claim to be Mannie's child was during her father's visitation. Maya stated that she told her sister, Melicia, and they all three had a

7

conversation. She testified that she and her sister were in shock. Maya stated that she does not know if Mannie is Jones' father.

¶13. Melicia then testified on behalf of the Estate. She testified that Mannie was her father, Mae is her mother, and Maya is her sister. Other than Jones' claim, Melicia was aware of no other possible heirs of her father. Melicia told the chancellor that she also first met Jones during the visitation for Mannie and that is when Jones first told her that she was her sister. She further testified that prior to Jones' claim after Mannie's death, she had never been advised that she had a sibling other than Maya. Melicia testified that she was not introduced to Jones at the funeral for Mannie's mother. On cross-examination, when asked about her feelings when Jones confronted her at her father's funeral, Melicia said that she was shocked and surprised by Jones' claim and did not believe it to be true.

¶14. The Estate then called Mannie's widow Mae to testify. She told the court that she and Mannie are the parents of Maya and Melicia. Mae testified that Jones was not Mannie's child. She denied meeting Jones at Mannie's funeral and that her daughters did not tell her about Jones' claim. At Mannie's mother's funeral in 1990, at which time Mannie was still alive, Mae told the chancellor that no one was introduced as Mannie's child, except Maya and Melicia. On cross-examination, she stated that she had no knowledge of who Mannie may have dated before they began their relationship. When asked if it were possible that Mannie fathered a child by another woman, she admitted that it was "a possibility." She said she first found out about Jones claiming to be Mannie's child through her attorney. At the conclusion of Mae's testimony, the Estate rested in its case-in-chief.

¶15.   Jones began her case-in-chief by offering into evidence the affidavit of her mother, Hazel L. Scott Newton Sanders, in which Hazel stated that Mannie was Jones' father. The affidavit was admitted into evidence over the objection of the Estate. Jones then called her childhood friend Yolanda Martin to testify concerning her knowledge of Jones' father. Martin stated that Mannie and her uncle were best friends. Martin testified that when Mannie would come to visit her family, Jones was often with him. Jones lived on the same street as Martin and Mannie would come by his house on the way to visit Jones' family. She testified that Mannie visited her uncle about once a week for many years when she was young. Martin described for the court time in which she interacted with Mannie and Jones. According to Martin, after her uncle moved to Jackson, she lived with him for a period of time. On one occasion, Mannie brought Jones when he visited Martin in Jackson. Finally, Martin testified that she witnessed Mannie interacting with Jones "more than 20 or 30 times in [her] life."

¶16.   Jones next called her younger sister, Joyce Hardy, to testify. Hardy testified that her mother had five children, and in addition to her and Jones, there were three brothers. Hardy identified a picture of Mannie as being her sister's father. When she was a small child, she remembered him coming to the house all the time. She testified that because she was so young, it would be hard for her to remember specific dates or occasions, but she remembered Mannie coming to visit a lot. She testified that when he visited, he would visit with her mother and play with Jones. She did not recall him spending the night. She stated that she does not have any pictures that show Mannie and Jones together. She stated that Mannie visited Jones in the hospital when Jones was diagnosed with cancer. Hardy said she saw

9

Mannie at the hospital at least three days straight. Hardy said that Mannie would talk with Jones and give her hugs and kisses. Hardy also testified that they all would often visit Mannie's mother at Eagle Lake.

¶17. Jones next called Fred Collins as a witness. Collins testified that Mannie was a lot older than he was, but he had known Mannie all his life. He said that Mannie owned rental property all over the place. Collins stated that he became a contractor and did work for Mannie "here and there." Collins said that he and Mannie talked about once a month, unless Mannie needed something. Hardy knew Mannie's mother, and he would see Mannie at her house often. Hardy testified that he met Jones about two years before Mannie's death. He put a metal roof on Jones' house and testified that Mannie paid him to do the work.

¶18. Jones then returned to the witness stand. She testified that she lived in Vicksburg and that she had a metal roof put on her house in February 2020. She told the chancellor that Mannie had Collins put the metal roof on her house. She stated that she did not talk to Mannie about it, that he just did it. She testified that she did not pay for the roof, but she saw Mannie pay Collins. She told the chancellor that Mannie never loaned her money, but that he sent her money. She had also exchanged text messages with Mannie in May and June of 2020, right before he went into the hospital. She testified that she last saw Mannie when he came to her house at the beginning of May 2020. She said that her oldest daughter and two of her grandchildren were present at the time. She also testified that Mannie came to visit her almost every day when she was in the hospital for cancer treatments. She said she went to Mannie's mother's funeral in 1990. She saw Mannie in 1989 when he was doing some work

10

for Kroger in Vicksburg. In 1985, after Jones gave birth to a son, she testified that Mannie came to visit her in the hospital in Jackson. Jones told the court that her mother, her husband, his father, and sisters were there when Mannie visited. Jones remembered seeing Mannie at her mother's house one time in 1983. He came to visit and dropped off some money for her mother. However, she said she saw Mannie give her mother money "plenty of times." She said it was in 1985 or 1987. Jones testified that she spent the night at Mannie's mother's house at Eagle Lake "plenty of times." She remembered one time, when she was thirteen or fourteen, that Mannie took her to JCPenney and bought her some clothes. Jones introduced into evidence a picture of her, her mother, and Newton. She then told the chancellor that although she knew of Maya and Melicia through Mannie, she actually met them at Mannie's mother's funeral in 1990. She did not say anything to them at the time about being their sister. Her counsel then asked her about the period between 1989 and 2019 and whether she had any contact with Mannie during those years. Jones said that she did not see him face to face, but he would call her or send gifts or flowers on her birthday and on holidays. She also remembered that Mannie put a microwave in her home in 2017 or 2018. She said that Mannie came to her house one time and had his electrician look at her breaker box, and she cooked him dinner.

¶19.    On cross-examination, she was asked to look at the picture she had introduced. She identified Newton at the time the picture was taken in 2015 as her mother's ex-husband. She acknowledged that he was listed as her father on her birth certificate. Jones admitted that she called Newton "Daddy Lawrence." She was questioned about the text messages she had

testified that she exchanged with Mannie but acknowledged that she did not have any to show the court. There was an exchange between counsel about getting the phone, but counsel for the Estate argued that no texts had been produced in discovery. She also admitted that she had only one picture of Mannie, but it was also on her phone. On redirect examination, Jones' counsel asked for a five-minute recess for Jones to retrieve her phone to show the text messages and photograph. Counsel for the Estate objected on the ground that those items were discussed during direct examination but were not introduced at that time. The chancellor sustained the objection. Testimony ended at that point, and the court advised both sides to submit briefs.

¶20.   The chancellor found that Jones had failed to meet the high standard of proof required in this case. We agree. There was no uncontradicted testimony that Mannie had acknowledged Jones to be his daughter. Most of the testimony presented by Jones' witnesses was hearsay. There was almost no physical evidence to support the testimony of Jones' witnesses, although, based upon the testimony, such evidence should have been available. There was little evidence of Mannie's financial support of Jones. There was also clearly what we consider to be minimal contacts between Jones and Mannie during the last thirty to forty years of Mannie's life. There was apparently a complete absence of pictures of Mannie and Jones together. As stated above in our standard of review, we must not disturb the chancellor's findings of fact on contradictory evidence "unless we can say with reasonable certainty that these findings were manifestly wrong and against the overwhelming weight of the evidence." *In re Estate of Davidson*, 794 So. 2d at 264 (¶8). We cannot say that the

12

chancellor's finding was manifestly wrong. This issue is without merit.

### III. Did the chancellor err in not ordering DNA testing?

¶21. Through new appellate counsel, Jones argues that the chancellor erred by failing to order the parties to submit to DNA testing to establish paternity. Jones contends on appeal that the chancellor should have denied her trial counsel's motion to withdraw her motion for DNA testing because the motion had not been set for a hearing and Jones herself did not sign the motion to withdraw. As noted above, however, it is clear that the DNA motion was set for hearing on multiple dates, and a hearing on the motion started January 12, 2022. The order entered by the chancellor after the hearing clearly stated that the motion was "continued until further hearing and consideration by the Court." Jones' counsel never brought the matter back before the chancellor until he moved to dismiss the motion.

¶22. In any event, Jones submits no authority to support her contention that the chancellor should have sua sponte ordered DNA testing and cites no authority to support her argument that the chancellor should have denied her own motion to withdraw her request for DNA testing because she did not sign the motion herself. We find that this issue is procedurally barred for failure to cite any authority in support of this argument. *See Quilantan v. State*, 418 So. 3d 560, 567 (¶18) (Miss. Ct. App. 2025).

### CONCLUSION

¶23. We find no reversible error by the chancellor and affirm the chancellor's finding that Jones failed to prove by clear and convincing evidence that she is the natural child of the deceased.

¶24.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE AND LASSITTER ST. PÉ, JJ., CONCUR. McCARTY AND WEDDLE, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**